No. 28,949.

D. A. RICKEL, *Appellant*, v. THE REPUBLIC MUTUAL FIRE INSURANCE COMPANY, *Appellee.*

(282 Pac. 757.)

Opinion filed December 7, 1929.

*W. C. Rickel,* of Kansas City, and *Nelson J. Ward,* of Belleville, for the appellant.

*W. D. Vance* and *Ralph M. Hope,* both of Belleville, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: This controversy presents the question whether under the terms of an insurance policy the word "grain" included cottonseed meal. The trial court held that it did not, and plaintiff appeals.

The facts were substantially these. The plaintiff carried insurance in defendant company for the total amount of $3,700, of which $2,000 was upon grain on the premises, in the barn, crib, gran-

ary, stack or shock. The insurance was against fire, lightning and windstorm. The plaintiff had cottonseed meal stored in a granary on the premises valued at $1,700, which was destroyed by fire.

The defendant is a mutual company organized under R. S. 40-421 and R. S. 40-423, and was incorporated to write insurance on—

"Dwelling houses, barns (except livery or hotel barns), accompanying outbuildings and their contents, schoolhouses, schoolhouse furniture, churches, church furniture, farm implements, hay, grain, wool and other products, live stock, wagons, carriages, harness, household goods, wearing apparel, provisions, musical instruments and libraries, being upon farms as farm property, or in dwellings, or in accompanying outbuildings, or in schoolhouses, or in churches, that constitute detached risks in villages and cities, and belonging to the member of the company. All risks in cities and villages which shall be fifteen feet or more from any contiguous risk shall be deemed detached within the meaning of this act."

The articles mentioned in the policy in question included "grain on premises, in barn, crib, granary, stack or shock."

The plaintiff invokes the rule with relation to stock insurance companies that policies of insurance are, under certain circumstances, construed most strongly against the insurer. This rule of construction does not have general application to policies of insurance written by mutual companies, such as the defendant. The insured under such a policy is in effect the insurer as well as the insured, so that the same strict rule of construction does not apply. This court has recognized the distinction between stock insurance companies and mutual insurance companies. For instance, in *Kennedy v. Farmers Alliance Ins. Co.*, 127 Kan. 768, 275 Pac. 214, it was said in the opinion:

"It is the duty of an agent soliciting insurance to prepare the application so it will accurately and truthfully state the result of the negotiations, and it has been held, in *Pfiester v. Insurance Co.*, 85 Kan. 97, 116 Pac. 245, and allied cases, that the agent's failure to do so is in legal effect the fault of the insurance company. But that was said with reference to stock companies. A different rule applies to mutual companies organized under R. S. 40-421, *et seq.* See *Akers v. Farmers Alliance Ins. Co.*, 118 Kan. 241, 234 Pac. 956, and cases there collected. These companies are organized by property owners who desire mutually to insure the property of their members. Before a person can have his property insured by such a company he must become a member of it and join with other members in their mutual obligations. In a sense he is both the insurer and the insured. The premiums paid by members constitute the fund from which losses and expenses are paid; the members share in the profits in proportion to their interest, and control and regulate the affairs of the company. (32 C. J. 1018.) The mutuality of obligation, of insurance, and of all the advantages is the main and essential feature of such a company. (32 C. J. 1019.) No policy of insurance is issued except on

written application. (R. S. 40-425.) The persons insured form the membership of the company. (*Brenn v. Insurance Co.*, 103 Kan. 517, 520, 175 Pac. 383.) The members elect their officers. (R. S. 40-427 to 40-429.) By-laws are authorized. (R. S. 40-436.) Each policy must have attached to it or printed thereon a copy of the by-laws, and these must be signed by the president and secretary of the company, and by the insured member. (R. S. 40-441.)" (p. 770.)

The plaintiff contends that cottonseed meal is "grain" the same as corn meal, or flaxseed meal, brans, shorts and other ground feeds or any other products of this character. We think not. The word "grain" has a clear, definite meaning. Webster gives this definition:

"1. In modern usage the seed or seedlike fruit of any cereal grass, as wheat, maize, oats, rice, millet, etc.

"2. Collectively: The unhusked or the threshed seeds or fruits of various food plants, now usually, specif., the cereal grasses, but in commercial statutory use (as in insurance policies, trade-lists, etc.), also flax, peas, sugar-cane, etc."

In 28 C. J. 757 "grain" is thus defined:

"Grain. A generic term; a kernel, especially of those plants, like wheat, whose seeds are used for food; specifically, a seed of one of the cereal plants collectively; a single seed or hard seed of a plant, particularly of those kinds whose seeds are used for food of man or beast; a single small seed; a small hard seed; the gathered seed of cereal plants in mass; the fruit of certain plants which constitute the chief food of man and beast; also the plants themselves, whether standing or gathered. Sometimes the term is used to designate a crop in a field, or cereals in the straw. In accordance with the context or the connection in which it is employed the term may include barley; bran; broomcorn; corn, in general, corn and millet hay; flax; hay or stalk; maize, millet; millet hay; oats, peas, rye, sugar-cane seed; wheat."

Cotton is not a common crop to this state. In 3 World Book, page 1607, the following are listed as states where cotton is generally produced: Oklahoma, Arkansas, North Carolina, Louisiana, Tennessee, Alabama, Texas, Mississippi, South Carolina, Georgia, Missouri, Florida and Virginia. Therefore we should say that since cotton is not grown generally in Kansas, neither it nor its products are the subject of an insurance policy covering farms and farm products unless specifically provided for. Cottonseed meal is a by-product of cotton "obtained by grinding the hard, dry cake left after the oil has been pressed out of the seeds. When sifted like flour it is an excellent stock food, and when mixed with acid phosphate it becomes a valuable fertilizer." (3 World Book, 1607.)

Cottonseed cake is a product of the cotton seed only and is com-

posed principally of the kernel with such portion of the hull as is necessary in the manufacture of oil. Cottonseed meal is cottonseed cake finely ground but not necessarily bolted. It must conform in all other respects to the definition of cottonseed cake. Cottonseed feed is a mixture of cottonseed meal and cottonseed hulls, containing less than 36 per cent protein. Cottonseed cake and meal are recognized under the law as commercial feeding stuffs under the provisions of the statute (R. S. 2-1001 et seq., Laws 1925, ch. 4), and are treated as manufactured feeding stuffs. (See sec. B, Report of Control Division, Kansas State Board of Agriculture, 1928, pp. 5, 21.)

In the 1928 Lincoln Library of Essential Information, page 1364, it is said:

"Cottonseed products. For every pound of cotton that is grown, about two pounds of cottonseed are produced. This seed was for many years considered a nuisance and was wasted or burned. It is now a very important part of the cotton crop because it yields food for man, food for cattle and food, or fertilizer, for growing plants. The dark greenish seeds, about the size of a pea, are covered with short fiber, or linters, which is removed by machinery after the seeds have been carefully sifted and cleaned. After delinting, they pass to the huller, where they are cut into pieces, beaten and sifted until the hulls are separated from the meats which they contain. The meats are then crushed between heavy rolls, cooked with steam, formed into cakes, and placed in a hydraulic press where the oil is squeezed out under a pressure of almost 4,000 pounds per square inch. The hard, dry cakes which remain are ground into cottonseed meal. One ton of seed yields about 315 pounds of oil, 920 pounds of meal, 600 pounds of hulls, 80 pounds of linters, and 85 pounds of dirt and waste which have no value. The linters are used as filler for pads and cushions, for making paper, for mixing with wool in shoddy and cheap felt, and in the manufacture of celluloid, guncotton and smokeless powder. The hulls often serve, like sawdust, for a packing material and are added to concentrated cattle foods to give bulk. The meal is valuable both as a fertilizer and as a rich food for all farm animals, while the oil, which is most important of all, has many uses in the production of edible and technical products."

The process of manufacture just outlined changes a grain into some other product. For instance, flour is not grain; neither is oatmeal nor corn meal. They, like cottonseed meal, are grain products. Cottonseed meal does not represent the entire cotton seed as do corn meal and oatmeal represent the entire grains from which they are made. In the process of the manufacture of cottonseed meal, the oil is extracted. Moreover, the seed is subjected to a process of cooking with steam, and then, after removal of the oil, is put into the form of cakes. This all takes place before the cottonseed meal results.

It may be observed that the by-laws of the defendant company provided for insurance of dwelling houses, barns, accompanying outbuildings and their contents, grain, wool and other products, wearing apparel, provisions being upon farms as farm property, or in accompanying outbuildings. Whereas the plaintiff's policy covered only grain on premises, in barn, crib, granary, stack or shock, etc. We are of the opinion that if the parties had intended to insure cottonseed meal on the premises they would have so indicated by including the item specifically, or at least would have included therein the term "provisions."

"In the case at bar the parties must, we think, have intended the policy to cover whatever was usually and ordinarily stacked on the farm or put into the granary. The term grain was used as being sufficient for this purpose. Wheat, rye, oats and flax would ordinarily be stacked together, and, from the combustible nature thereof, if the wheat caught fire the flax would ordinarily be burned if the wheat was. The intent of the plaintiff undoubtedly was to insure his crop raised on the farm, and put it into stacks or into a granary and the company must, we think, have so understood, and executed the policy with the intent of insuring the property in question." (*Hewitt v. Watertown Fire Ins. Co.*, 55 Ia. 323, 325, 7 N. W. 596.)

"A policy or contract of insurance is to be construed so as to ascertain and carry out the intention of the parties, as it appears from the language of the whole instrument, viewed in the light of the surrounding circumstances, the object or purpose of the contract, its subject matter, the matters naturally, or usually incident thereto, the risk insured against, the situation of the parties, the business in which they are engaged at the time, their relation to each other, and the general undertaking of the company towards its policyholders." (32 C. J. 1148.)

The "surrounding circumstances" in contemplation of the parties in the instant case constituted a policy of insurance covering a house, a granary and grain stored in the granary, all on a farm. The object or purpose of the contract, in our opinion, was to insure the products of plaintiff's farm. There was no intention to include in the property to be covered by such insurance a manufactured article brought to the premises from another state.

The judgment is affirmed.