Argued October 21, 1953, affirmed July 13, petition for rehearing
denied October 13, 1954

I-L LOGGING COMPANY *v.* MANUFACTURERS &
WHOLESALERS INDEMNITY EXCHANGE

273 P. 2d 212
275 P. 2d 226

*Robert F. Maguire* and *Howard K. Beebe,* of Portland, argued the cause for appellant. With them on the brief were William E. Walsh, of Coos Bay, and Maguire, Shields, Morrison & Bailey, of Portland.

*George Black, Jr.,* argued the cause for respondent. On the brief were Black & Kendall, of Portland, and McKeown & Newhouse, of Coos Bay.

ROSSMAN, J.

This is an appeal by the plaintiff from a declaratory decree of the circuit court, which held that a policy of liability insurance issued by the defendant to the plaintiff did not protect the latter against the liability which it incurred June 21, 1947, when a motor vehicle operated by the plaintiff, and in which some of its employees were being transported from their place of employment to their living quarters, overturned, resulting in the death of some and in the injury of others. Following the misadventure, many actions were filed against the plaintiff. The challenged decree was entered after trial. The plaintiff submits 19 assignments of error.

The policy of liability insurance which the defendant issued to the plaintiff bound the defendant

"to pay on behalf of the Insured [appellant] all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law * * *, for damages * * *, because of bodily injury, * * * including death at any time resulting therefrom, sustained by any person or persons".

The policy also contained this provision:

"This policy does not apply * * * to (a) * * * any employee of the Insured while engaged in the employment of the Insured * * *, or (b) any obligation for which the Insured or any company as his insurer may be held liable under any workmen's compensation law".

The defendant contends that the exclusion clause just quoted rendered the defendant nonliable for the losses which the plaintiff suffered June 21, 1947. The plaintiff takes the opposite position. The resulting issue is the principal one submitted by this suit.

The first and fifth assignments of error read as follows:

"The trial court erred in finding that the injuries and death of appellant's employees were sustained while engaged in appellant's employment."

"The court erred in refusing to find that the liability and obligation of appellant for the injuries and deaths was not a liability under nor an obligation imposed by any workmen's compensation law."

We will now consider the first of those assignments of error and, ancillary to it, the second. At the time of the accident which caused the injuries and deaths that gave rise to the actions against the plaintiff, the latter was engaged in logging operations in rough,

rugged country. Many years ago when it began its operations, the timber was within walking distance of the camps which the plaintiff maintained for its employees, but, as more and more trees were felled, the distance between the areas where the men worked and where they lived increased to such an extent that the plaintiff faced a transportation problem. At the time of the accident which we have mentioned some of the plaintiff's loggers lived in a camp six miles from where they worked and some in homes 25 or 30 miles from their work. When the plaintiff first faced the transportation problem, it rented to the men a truck which they used in going to and from their work. The men operated the vehicle through an employees' association, but, due to the recurrent turnover in their ranks, the maintenance of the association proved difficult. Eventually the plaintiff resorted to the means of transportation which it employed when the accident which we have mentioned took place. The method which it adopted was to haul the men back and forth in busses, known as "crummies".

Mr. John L. Hawkins, plaintiff's manager, explaining in part the evolutionary process which led to the plaintiff's inauguration of bus service, gave this testimony:

"It started during the war when tires and gasoline were rationed and the men couldn't get to and from their work by their own automobiles and car pools were formed and it was still not satisfactory, and most all of the companies put on busses at that time and the men liked it so well that we were never able to get rid of them and we continued after the war."

According to Mr. Hawkins, the plaintiff had eight busses which were used solely for the transportation

of the men. The one which brought death and injury to its occupants carried 18 men at the time of the misadventure. The plaintiff owned the busses, paid the drivers and all other expenses. No charge was made to the men who rode in the busses. When a bus became disabled, the plaintiff at times substituted a vehicle which the witnesses termed a flatbed.

The evidence warrants a belief that the plaintiff supplied the bus service to its men because it was good business for it to do so. For example, Mr. Hawkins made this statement:

"Q Now, you, I-L Logging Company, considered that the furnishing of this crummy transportation was in the best interests of the I-L Logging Company and in the promotion of its business, did you not, that is why you did it?

"A I believe that is a fair statement.

"Q And it is also a fair statement to say that you, I-L Logging Company, furnished this transportation to assist the men in connection with their employment with you, that is a fair statement, too, isn't it?

"A I believe so."

A belief is justified that the busses were the only practical means whereby the men could go to and return from the place of their employment. One of the employees gave this testimony:

"Q Was there any way for you to go up there and get back, other than the crummy?

"A No."

The following is taken from the testimony of one of the crummy drivers:

"Q Do you know of any way that was available to the men, to get up to the Cox Creek landing, other than riding in your crummy?

"A It was either in my crummy or else in the boss's pick-up truck.

"Q Sometimes somebody rode with the boss?
"A Sometimes. They hardly ever did.

\* \* \*

"Q Were the men urged to ride in the crummies?
"A It was either ride in it or don't, there was no other way of getting up there unless it was with the boss in the pick-up.
"Q It was either ride in it or not work?
"A That is right."

We do not believe that the foregoing and other testimony to like effect indicating that the crummies were the only practical means of going back and forth is questioned by the plaintiff.

The record indicates that when men were taken into plaintiff's employ they were told, in the event they inquired concerning the subject, that the plaintiff furnished transportation to and from the woods. For example, the plaintiff's foreman, who had charge of the hiring of the men, testified:

"Q When men would ask you for a job, they would discuss the job and ask how they would get to and from their work?
"A Some of them.

"Q Some of them did that?
"A Yes.

"Q And those that asked you how they got to and from their work, you would tell them as part of the employment arrangement that I-L Logging Company would agree to transport them?
"A Yes."

The crummies, their safety, and grievances arising out of them were at times features of negotiations between the plaintiff and the labor union which represented its employees. One witness swore that a labor contract negotiated by the union granted the men the right to free transportation.

At the place where the accident which underlies this suit occurred, the bus was running upon a private logging road which the plaintiff had constructed and over which it had exclusive control. Access to the road was controlled by a gate and a watchman in the plaintiff's employ. Parts of the road were planked and other parts were dirt. It was a single-lane road although at places turnouts were provided so that in the event a log truck met another vehicle, such as a crummy, the two could pass. The following part of the findings of fact is fully justified by the evidence:

"* * * it was not too safe or practical a practice for the men to use their own cars to go to and from said logging operations and this was not generally done; that there was not sufficient parking space for private vehicles at the place of actual logging operations and that said road and access to said operations was not suitable for private cars."

The accident under review occurred upon a severe grade and happened when the vehicle was returning the men to their homes at the close of the day's work. Somehow it escaped from the driver's control, plunged over an embankment and overturned. Several of the men were killed and many were injured.

The wages of the plaintiff's employees started when they reached the place of their work in the woods and stopped when the whistle blew at the landing, except for men who were deep in the woods. Those few were paid for walk-out time. The men who rode in the busses were not paid for the time so spent and performed for the plaintiff no duties while riding.

The findings of fact state:

"At all times material herein, plaintiff was engaged in a hazardous occupation within the pur-

view of the Workmen's Compensation Law of Oregon; that prior to the issuance of defendant's policy of insurance to the plaintiff, plaintiff herein had elected not to contribute to the industrial accident fund of Oregon, and had insured its liability to its employees by securing an employer's liability policy, issued to plaintiff by Lloyd's Underwriters at London, * * *.''

The findings of fact also state:

''* * * the injuries to or death of the workmen, referred to in the plaintiff's complaint and supplemental complaint, were received at said time and place while engaged in the employment of the plaintiff, under the circumstances aforesaid, and also arose out of and in the course of said employment.''

Another finding declares the following:

''Any liability, if any, which existed on the part of the plaintiff to its workmen and/or their representatives or beneficiaries, for injuries or death in this accident, was, under the circumstances applicable to this accident, a liability for which the workmen could have recovered under the Workmen's Compensation Law of Oregon, had they been under that Act; that, also, the injuries and/or death suffered by plaintiff's employees in and as a result of said accident, were received and suffered by them while engaged in the employment of plaintiff I-L Logging Company; that none of said injured or deceased workmen were domestic employees.''

On or about June 24, 1947, the plaintiff demanded that the defendant assume liability under its policy of insurance and notified defendant that, in the absence of assumption of such liability, the plaintiff would negotiate settlement. June 25, 1947, the defendant communicated to the plaintiff its denial of liability under its policy and claimed that any loss to or liability

of plaintiff resulting from the accident came under the exclusion clause which we have quoted. Still later the actions which we have mentioned were filed. One of them which went to trial resulted in a verdict and judgment against the plaintiff in this case. Thereafter the other claims were settled. The foregoing suffices as a statement of the controlling facts.

By reverting to the paragraph of this opinion which quotes from the exclusionary clause of the policy of insurance issued by the defendant to the plaintiff, it will be noticed that the policy does not provide protection for the plaintiff if injury was incurred by "any employee of the Insured while engaged in the employment of the Insured". The parties, in well written briefs, have called to our attention a wealth of authority which bears upon the construction of the exclusion clause.

*Lamm v. Silver Falls Timber Co.*, 133 Or 468, 277 P 91, 286 P 527, 291 P 375 (appeal denied 282 US 812, 51 S Ct 214, 75 L ed 727) ; and *Varrelman v. Flora Logging Co.*, 133 Or 541, 277 P 97, 286 P 541, 290 P 751 (appeal denied 282 US 813, 51 S Ct 214, 75 L ed 728), presented facts substantially similar to those in the case at bar. They were decided 24 years ago. Each of the plaintiffs in those cases was employed in a logging camp and each was injured while being transported by his employer upon the employer's logging railroad. Since the Lamm and Varrelman cases were decided, log truck roads have gained favor over logging railroads. In those cases the logging railroad was the most practical means which the workman had for going back and forth between his place of employment and the nearby towns where he purchased his clothing, sought recreation and attended to his other needs. Both of the employers, defendants in

those cases, permitted their employees, as incidents of the contract of employment, to use the logging railroad as their means of transportation. Succinctly stated, the two decisions held that, since the men were injured upon the employer's premises and by hazards to which their employment subjected them, each was injured in an "accident arising out of and in the course of his employment", as that phrase is used in § 102-1752, OCLA (ORS 656.152). In reaching its result, the court sought to give to the employees the coverage for industrial hazards which is contemplated by workmen's compensation legislation.

The holdings in the Lamm and Varrelman cases appear to warrant a belief that if compensation had been sought from the industrial accident fund (§ 102-1735, OCLA, ORS 656.452 and 656.466) for the unfortunate mishap which occurred June 21, 1947, and if the employer [this plaintiff] had been a contributor to the fund, an order would have been entered awarding compensation.

When an employee of a contributor to the industrial accident fund sustains an injury and seeks compensation from the fund, he must show that his injury was the result of an "accident arising out of and in the course of his employment". As we have seen, the Lamm and the Varrelman decisions held that injuries sustained in accidents closely paralleling the instant one arose out of and in the course of the workman's employment.

But the plaintiff points to the fact that the exclusionary clause of the policy of insurance which the defendant issued does not employ the language of the workmen's compensation law. It argues that the words "engaged in the employment of the Insured" found in the policy do not mean the same as "arising out of

and in the course of his employment", as those words occur in the workmen's compensation law. According to the plaintiff, the unfortunate occupants of the crummy had finished their day's work and were no longer "engaged" in the plaintiff's employment when they entered the vehicle. They were members of the common public when the casualty occurred, so the plaintiff insists. In support of its claim that the words of the exclusionary clause are not the equivalent of "arising out of and in the course of", the plaintiff cites *Francis v. Scheper*, 326 Mich 441, 40 NW2d 214, and *B. & H. Passmore M. & R. Co. v. New Amsterdam Casualty Co.* (10 Cir), 147 Fed2d 536. It believes that the Lamm decision supports its view. The plaintiff acknowledges that *Lumber Mutual Casualty Co. v. Stukes* (4 Cir), 164 Fed2d 571, takes a position contrary to the holdings in the Francis and Passmore decisions. The Passmore decision was written by Judge Phillips and the Lumber Mutual by Judge Parker. The Lumber Mutual decision cited the Passmore opinion but declined to follow it. It indicated that "confusion in the law" would result from efforts to distinguish between the phrase used in exclusionary clauses and those in workmen's compensation laws. The briefs of the parties give much space to the four decisions just mentioned. We will now examine those decisions, not only for the purpose of determining whether they assigned different meanings to the language of the exclusionary clauses and those of workmen's compensation acts, but also for the purpose of ascertaining the legal principles which guided the courts in reaching their conclusions.

In the Francis case, the plaintiff was a painter whose work took him to various places. His employer's name was Houck. The plaintiff was injured

while riding home, at the close of the day's work, in a truck which Houck owned. Houck had agreed, as an incident of the contract of employment, to transport the plaintiff to and from his work. The mishap occurred while another of Houck's employees was driving the truck. The plaintiff recovered judgment against Houck and, upon the latter's failure to discharge the the judgment, instituted garnishment proceedings against Houck's insurer. That turn of events resulted in the decision now under review. The policy of insurance excluded coverage for "bodily injury to or death of any employee of the insured while engaged in the employment other than domestic of the insured". The insurer, as garnishee, in arguing that the plaintiff, while riding home in Houck's truck, was "engaged in the employment" of Houck, depended in part upon the holdings in compensation cases in which courts have ruled that a workman, injured while availing himself of transportation furnished by his employer, received his injury in an accident which arose out of and in the course of the employment. The plaintiff, upon the other hand, stressed the facts that (1) his injury befell him after the close of his day's work; (2) he was at liberty to go home by any means that he preferred; (3) he was not paid for the time spent in traveling home; and (4) he had no duties to perform for Houck while he was being transported. According to him, he was merely collecting part of his pay [his ride home] when he was injured. The court, in holding that the policy's exclusionary clause did not bar the plaintiff, declared that provisions such as "arising out of and in the course of his employment" found in workmen's compensation laws receive liberal construction because measures of that kind are remedial in nature, but that ambiguous terms such as "engaged

in the employment'' which occur in exclusionary clauses of policies of liability insurance are strictly construed against the insured. In support of its holding it cited *B. & H. Passmore M. & R. Co. v. New Amsterdam Casualty Co.,* supra. It held that ''engaged in the employment'' means active in the work which the plaintiff was employed and paid to perform.

We now turn to the Passmore decision. As we have stated, it was written by Circuit Judge Orie L. Phillips. Circuit Judge Huxman concurred and Circuit Judge Bratton dissented. The facts in the Passmore case were substantially similar to those in the case just reviewed. In the Passmore case, the employee, whose name was Little, lost his life while riding home at the close of his day's work in his employer's truck. The employer, a corporation entitled 'B. & H. Passmore M. & R. Co., was engaged in the roofing business and had a shop in Oklahoma City. The nature of Passmore's work required Little to 'go to various places in covering structures with roofing. On the day of the fatality Little had worked at a place nine miles from Passmore's shop. Little frequently drove his own automobile to and from the places where he performed his work, but the trial court found that, by implication, he was entitled to transportation. He was paid upon an hourly basis and received no pay while going to or returning from the place of his work. Upon the death of Little the latter's widow instituted an action against Passmore for damages upon charges of negligence. Passmore thereupon demanded that New Amsterdam Casualty Company, which had issued it a policy of liability insurance, defend the action. A provision of the policy follows: ''This policy does not apply: * * * to bodily injury to 'or death of any employee of the insured while engaged in the business,

other than domestic employment of the insured,''. The insurer denied liability and presently instituted a suit for a declaratory judgment as to the rights and duties of the parties. The trial judge sustained the insurer's position and held that under the exclusion clause Little was an employee engaged in his employment at the time of the fatality. Upon appeal, the Circuit Court of Appeals at first affirmed the trial court's ruling, but later, upon rehearing with Judge Bratton dissenting, withdrew its decision and reversed the trial judge. Its final opinion spoke of the case as ''a borderline case''. In reversing itself, it employed the reasoning which was later adopted by *Francis v. Scheper* which we reviewed in the preceding paragraph. The decision upon rehearing, written by Judge Phillips, held that the words of the policy ''engaged in the business'' mean that the individual whom the insurance company wishes to exclude must have been ''active'' in the business of the insured at the time of the accident, and that Little's situation as a passenger did not suffice. The opinion stated that workmen's compensation legislation receives liberal construction, whereas policies of insurance are construed in favor of the insured. It commented upon the fact that courts, in seeking the meaning of contracts, endeavor to discern the real interest of the parties, that is, their mutual understanding, but that since statutes are devoid of the element of mutual understanding, their construction presents only the problem of giving effect to the intention of the legislature. The court did not expressly state that the terms ''while engaged in the business * * * of the insured'' and ''arising out of and in the course of his employment'' do not mean the same, but it is clear that since the one group appears in a policy of insurance and the other in a statute,

it attached different consequences to their use. The opinion cited, in support of its holding that Little was not engaged in the business of Passmore at the time of the casualty, *Green v. Travelers Insurance Co.*, 286 NY 358, 36 NE2d 620, *Elliott v. Behner*, 150 Kan 876, 96 P2d 852, and *State Farm Mutual Auto Ins. Co. v. Skluzacek*, 208 Minn 443, 294 NW 413. In the Green case, the injured workman was a berry picker whose contract of employment, neither by express words nor by implication, entitled him to transportation. At the time of his injury he was on his way to the berry fields in his employer's truck. The decision said:

"* * * In such case the transportation was a gratuity and not a part of May's employment. * * * Where the employer gives the employee a ride merely as a matter of accommodation, the ride is a gratuity and not a part of the employment."

The policy of insurance issued by the defendant excluded liability to "any employee of the insured while engaged in the business of the insured." The decision affirmed the judgment of the trial court against the insurer. Two members of the court dissented. In *Elliott v. Behner,* one Albert Elliott, whose death while riding in a truck driven by the defendant was the subject matter of the case, was an employee of Montgomery County which was the owner of the truck. The truck was used for transporting county employees from place to place. The men were under no duty to ride in it and when they availed themselves of the privilege of being conveyed home in it at the close of the day's work, they paid no fare. The trial judge found that conveyance in the truck was an implied condition of the contract of employment, but the Supreme Court took no sides upon that issue. The action which led

to the decision under review was not filed against the county but against the employee of the county who drove the truck. The fatality occurred when the defendant was driving the truck home at the termination of the day's work. After judgment had been recovered and the defendant had failed to satisfy it, a writ of garnishment was levied upon the Employers Casualty Company which had issued a policy of insurance to the county. The policy named as the "assured" not only the county but also "any other person * * * while using such automobile * * * provided that such use is with the permission of the named Assured". The exemption clause contained this phrase, "while engaged in any business or occupation of the Assured". The trial court entered judgment against the garnishee. With two members dissenting, the appellate court affirmed the judgment. The fact that the defendant in the negligence action was not the employer but the driver of the truck seems to indicate that the liability which was invoked against the insurer was under the public, as distinguished from the employer, clauses of the policy. The decision said: "The trip home in the truck was no part of his employment." In *State Farm Mutual Auto Ins. Co. v. Skluzacek,* one of the defendants, Skluzacek, was a farmer who had hired the other defendant, Sibell, a 16 year old boy, and some other boys to weed an onion field. Upon an occasion when Skluzacek was about to drive his truck from his home to the onion field, a quarter of a mile distant, the boys jumped on the truck to get a ride. After the truck had reached the field and the boys had alighted, the truck bumped into Sibell. The plaintiff had issued a policy of insurance which denied protection "for bodily injury to any employe of the insured while engaged in the business of the assured."

The trial judge found

" 'that the riding on said truck' by Sibell 'was gratuitous and permissive, a mere favor, and not in furtherance of' the employer's 'business, nor did the riding become by implication part of the employment contract,' and that 'said employe owed his employer no duties except for the fieldwork in the onion field.' It concluded that when Sibell received 'said injuries, he was not an employe engaged in the business of the assured.' "

The decision under review was based upon a suit for a declaratory judgment which the insurer had filed. The decree of the lower court was affirmed.

It will be observed that in the Green and Farm Mutual cases, the injured persons were not entitled to transportation as a part of their contracts of employment. In the State Farm Mutual case, the injured boy merely helped himself to a ride. In the Elliott case, the defendant was not the employer.

We now return to the Passmore decision. We have taken note of the rules of construction which it employed and of the three decisions which it cited in its support. The opinion declined to hold that the term "while engaged in the business * * * of the insured" has the same meaning as "arising out of and in the course of his employment." In expressing itself, the court said:

"No doubt, under certain particular situations there would be no doubt that the employee either was or was not engaged in the business of his employer. But, in a borderline case, such as is here presented, we think the rule of strict construction of the exclusion clause has legitimate application."

We come now to *Lumber Mutual Casualty Insurance Co. v. Stukes*—a suit for a declaratory judgment. Although an ancillary issue which the suit developed

must be mentioned, in all essentials the case was a counterpart of the Passmore suit. In the Lumber Mutual case, one Marshall, who owned a truck and to whom the plaintiff had issued a policy of liability insurance, was engaged in the roofing business. The policy covered the truck with an omnibus clause which defined the word "insured" as including "any person while using the automobile * * * provided the actual use of the automobile is with the permission of the named insured." The policy's exclusion clause provided that coverage did not apply to "bodily injury to or death of any employee of the insured while engaged in the employment." One Timmons put on the roofing under the contracts which Marshall obtained. Timmons performed his work with the help of several laborers, one of whom was Eugene Stukes. Timmons, with Marshall's approval, carried the laborers to and from their work in Marshall's truck. Upon the occasion which resulted in the case under review, Timmons, while driving the truck home at the close of the day's work, collided with another vehicle and Stukes was killed. After the administrator of Stukes' estate had filed an action against Marshall to recover damages for the death, the plaintiff [insurance company] instituted the suit under review to obtain a declaration of rights and duties. The administrator of Stukes' estate, as a part of his effort to prove that Stukes was a passenger while riding in the truck, and not an employee, presented evidence that three per cent of Stukes' wages was deducted for transportation. Marshall admitted that he made the deduction, but, according to the decision, the amount "was in reality deducted to pay unemployment insurance, which the South Carolina statute forbid an employer to deduct from an employee's wages." The trial court entered

judgment for the defendant upon a directed verdict. The judgment was reversed by the Circuit Court of Appeals in the decision now under review. The decision of the latter court, written by Judge Parker, took note of the fact that under the evidence conflicting inferences could be drawn concerning Timmons' status. One inference would deem him an independent contractor, the other as Marshall's foreman. The decision stated that it was clear that Marshall paid the laborers their wages and made the bookkeeping entries. The court held that if Timmons was Marshall's foreman, as the plaintiff argued, Stukes was clearly the employee of Marshall. But, on the other hand, if Timmons was an independent contractor, then he [Timmons] was an additional insured within the purview of the provision of the policy, which reads: "Any person while using the automobile * * * with the permission of the named Insured". If Timmons was an independent contractor, and if Stukes was his employee, the policy of indemnity insurance would be available to Timmons. Accordingly, it was necessary to determine whether when Stukes lost his life he was "engaged in the employment" of his employer, regardless of whether the latter was Marshall or Timmons. Thus we see that the case presented the same basic issue as the Passmore case. The decision held that "the purpose of the exclusionary clause is to limit coverage to liability for injury to members of the general public and to exclude liability to employees of the insured." In holding that Stukes was engaged in his employment at the time of the fatal mishap, the decision said:

> "And we do not think that the exclusion clause can be held inapplicable on the ground that Stukes was not 'engaged in the employment' of either

Marshall or Timmons at the time of the accident, but was riding in the truck as a 'fare paying passenger.' The evidence shows beyond question that he was transported to and from work as an incident of his employment, whether 3% was deducted from his wages on this account or because of the requirement that unemployment insurance be paid. Such transportation was a part of his contract of employment; and there can be no question that under the law of South Carolina he enjoyed the status of an employee engaged in the employment at the time of the accident which resulted in his death. * * * As said by Chief Justice Baker of the Supreme Court of South Carolina in the Ward case, just cited [188 S.C. 233, 198 S.E. 387]: 'Appellant has cited numerous cases from other jurisdictions holding that in going to and returning from the place of employment, if it is a part of the contract that the employee be furnished by the employer transportation or the means of transportation to and from work, the employment continues during the transportation, but we need go no farther than the decisions of this court. The case of Covington v. A. C. L. R. R. Co., 158 S.C. 194, 155 S.E. 438, cites with approval the case of Sanders v. Railway Company, 97 S.C. 50, 81 S.E. 283, and holds that an employee returning from his work by means of transportation furnished him for that purpose by the employer is still engaged in the discharge of the duties of his employment. While these cases were brought under the Federal Employer's Liability Act 45 U.S.C.A. § 51 et seq., the principle is the same, and is here applicable.'

"See also Johnson v. Aetna Casualty & Surety Co., 5 Cir. 104 F.2d 22; and State Farm Mutual Automobile Ins. Co. v. Brooks, 8 Cir., 136 F.2d 807, where persons being carried home from work in a motor vehicle of the employer were held employees and engaged in the business for which employed within the meaning of just such an exclusion clause as is here involved. To the contrary is B. & H.

Passmore M. & R. Co. v. New Amsterdam Casualty Co., 10 Cir., 147 F.2d 536. We are not impressed by the argument that, because of what is said to be the attitude of South Carolina courts towards insurance policies, a person in South Carolina is to be held an employee 'engaged in the discharge of the duties of his employment' for purposes of the Workmen's Compensation Act, Code 1942, § 7035-1 et seq., but not such an employee where an insurance policy is involved. There is no decision of the South Carolina courts to that effect; and in matters of this sort there is every reason why confusion in the law should be avoided. It should not be overlooked, furthermore, that these public liability policies are drawn with the express purpose of excluding injuries covered by workmen's compensation laws. One of the provisions of the policy in question excludes any obligation 'for which the insured * * * may be held liable under any workmen's compensation law.' "

The Lumber Mutual decision, written by Judge Parker and the Passmore decision, which came from Judge Phillips, reached conclusions opposite to each other. Upon first reading the two decisions appear not to have employed the same rules. Judge Phillips concerned himself largely with the familiar rules that govern the construction of writings. He held that compensation legislation, being remedial in nature, should be liberally construed in favor of the workman and that exclusionary clauses in policies of insurance should be strictly construed against the insurer. Judge Parker was also concerned with the rules that govern the construction of writings, but approached construction from a different angle. He seemingly took as his polestar a belief that the purpose of exclusionary clauses is "to limit coverage to liability for injury to members of the general public and to exclude liability to employees of the insured." Thus he tried to dis-

cern the actual purposes for which employers obtain insurance of that kind and the problem which they face. Having taken that view of the objectives of the exclusion clause, Judge Parker proceeded in a practical manner to determine whether a workman, who rides home in a conveyance provided by the employer as a part of the contract of employment, was still a workman "engaged in the business" of the employer while on his way home. We said that he proceeded with the inquiry just mentioned in a practical way, for he spoke of the constant necessity that courts face of not losing sight "of the substance of the relationship in attempting to apply rule of thumb distinctions." Judge Phillips also saw that hard facts, rather than definitions, frequently settle issues of the kind that the two cases presented, for he said: "Under certain particular situations there would be no doubt that the employee either was or was not engaged in the business of his employer." He termed the case before the court as a "borderline case." The rules of construction which Judge Phillips employed are not of statutory rank. They are guides which experience has shown generally lead to the right result but which may be ignored when the record furnished the court with better indices to the party's intentions. It seems clear that Judge Parker believed that the general purposes for which an employer obtains insurance protection constitutes a superior guide to the meaning of the policies. Although the issue which underlay the two decisions, when expressed in legal terms, takes the form in which the two decisions cast it, yet an employer who faces the problem of procuring protection for himself against potential damage actions which may be instituted by his employees and other protection against suits which members of the public may file, very likely would

express the problem in a different way. Possibly an employer regards his relationship with his employees, whether they are in the shop actively running a machine or in a conveyance which he owns and in which he daily takes them to and from work, as very different from his relationship with the common public. He may feel that when the men are in the bus their status is no different from that which they hold when they are in other parts of his plant which he has provided for their convenience and for the additional purposes of promoting better relationships and of stimulating production. Few plants contain nothing except the machinery of production, and it is rare that an employee keeps his nose to the grindstone for the entire day. Many plants include such facilities as lavatories, drinking fountains, lunch rooms, parking lots and assembly halls. *Kowcum v. Bybee,* 182 Or 271, 186 P2d 790, arose out of an injury which an employee suffered in a parking lot which the employer of both the plaintiff and the defendant maintained for his workmen. It may safely be assumed that facilities of the kind just listed are intended to serve the same general purpose as vehicles for the transportation of the workmen. Anything which attracts to the plant better workmen and induces them to put forth superior efforts gives the employer a greater return for the wages which he pays. In view of the problem of procuring protection from tort liability, it might never occur to the employer that some court would hold that when the workman stepped over the threshold of the factory door into a parking lot or into the company's bus, he had left the plant. The employer might believe that his workmen were still his employees while they remained within his domain and were doing the things which he regarded as beneficial to superior production. Reflections of that kind

may have prompted Judge Parker to his belief that "The purpose of the exclusion clause is to limit coverage to liability for injury to members of the general public and to exclude liability to employees of the insured." The most difficult task is to ascertain the point at which the individual changes from an employee into a member of the common public. Judge Phillips believed that unless the employee was active in his work when the accident occurred he was not engaged in his work and was, therefore, a member of the common public. Under his interpretation, the exclusion clause demanded that the employee should be upon the production line actively participating in the work. Accordingly, when he was seated in the bus on his way home, he was not "engaged" in his work but was a member of the common public. Judge Parker held that under the exclusion clause the workman had not reverted to the common public when (1) the transportation back to his home was provided by the employer as an incident of the contract of employment, and (2) the injury was received under circumstances for which an award of workmen's compensation would be ordered if the workmen's compensation law were applicable; for, as the decision put it, "One of the provisions of the policy in question excludes any obligation 'for which the insured * * * may be held liable under any workmen's compensation law.' " The foregoing completes our comparison of the two lines of reasoning.

*Lamm v. Silver Falls Timber Co.,* which the plaintiff believes indicates that there is a difference in meaning between the terms, "injury arising out of and in the course of employment" and "engaged in the employment", made no effort to indicate the manner in which the latter phrase should be interpreted. It

was not concerned with any exclusion clause of a policy of insurance.

The Francis, Passmore and Lumber Mutual are only three of the decisions which the briefs of counsel have called to our attention, but the reasoning in them is typical of that which all of the decisions employ.

In addition to the Francis and Passmore decisions, *Elliott v. Behmer,* 150 Kan 876, 96 P2d 852, [with two justices dissenting] held that an employee, who, at the termination of his day's work is given gratuitous transportation home, is not engaged in his employment while seated in the home-bound conveyance. Taking the opposite view and joining with the Lumber Mutual decision are *Johnson v. Aetna Casualty & Surety Co.,* 5 Cir, 104 Fed2d 22; *State Farm Mutual Automobile Ins. Co. v. Braxton,* 4 Cir, 167 Fed2d 283; and *Westcott v. United States F. & G. Co.,* 4 Cir, 158 Fed2d 20.

In *Johnson v. Aetna Casualty & Surety Co.,* supra, the employer, one Frank Green, operated a small sawmill in South Carolina, 40 miles from the town in Georgia where he and his workmen lived. Each Monday morning when Green went to his mill he took with him in his truck his sawmill hands, and on the following Saturday when he returned home he brought them with him in the truck. Upon the occasion which resulted in the decision under review the truck collided with another, resulting in the death of one of the workmen and the injury of another. Green had a policy of insurance issued by the plaintiff which protected him from damage claims arising out of the operation of the truck, but which contained an exclusion clause rendering the policy inapplicable "to bodily injury or to death of any employee of the insured while engaged in the business of the insured." When actions were threatened against Green, the plaintiff instituted

a suit for a declaratory decree. In affirming the decree of the District Court, which held that the plaintiff was not liable under its policy, the Circuit Court of Appeals said:

"* * * The transportation to and from the mill was not expressly a term of the hiring of the hands, but had been afforded for several years, it was understood that they could ride if present when the truck started. We think the judge was warranted in concluding that the transportation was an implied term of the employment. The distance from the homes of the men to their work was so great that transportation must have been considered by both employer and employee. The ride was not for the mere convenience of the employee after his work was done, but was for the forwarding of the employer's work in that it was necessarily provided to get these employees for the very moderate wages paid them. No one would doubt that to carry them forty miles to work on Monday was forwarding the sawmill enterprise, or would think the employer had discharged his obligations if he had left them in the woods forty miles from home on Saturday. It has often been held that employees riding free to and from their work in the employer's vehicle continue to be employees and are not passengers, Ellington v. Beaver Dam Lumber Co., 93 Ga. 53, 19 S.E. 21; Railey v. Garbutt & Co., 112 Ga. 288, 37 S.E. 360; Roland v. Tift, 131 Ga. 683, 63 S.E. 133, 20 L.R.A., N.S., 354; Dwan v. Great Eastern Lumber Co., 15 Ga. App. 108, 82 S.E. 666; Great Southern Lumber Co. v. Hamilton, 137 Miss. 55, 101 So. 787; * * *.

"Since Johnson and Radford were when injured by the operation of the truck still employees of Frank Green, the policy clearly does not protect Green, for under Exclusions it provides: 'This policy does not apply * * * (e) to bodily injury or to death of any employee of the insured while engaged in the business of the insured * * * or to any obligation for which the insured may be

held liable under any workmen's compensation law.' Both in Georgia, where the employment contract was made and South Carolina where the work was to be done and where the injury occurred, there is a workmen's compensation law, and one of them is applicable under our holding that Johnson was killed and Radford injured while yet employees in the course of their employment; but if a common law liability can be elected, the policy still by its terms does not apply.''

The foregoing completes our review of the authorities. In the cases of which we have taken notice, the injury was sustained while the conveyance was being operated upon a public thoroughfare. In those cases transportation in the employer's vehicle was not the only practical method whereby the employee could go to and from his place of employment, with the exception of *Johnson v. Aetna Casualty & Surety Co.*, supra. In the case at bar, the employees had no practical means whereby they could travel to and from their place of employment except in the busses which the plaintiff provided. Moreover, in the instant case, the route which was traveled was a private road which was under the exclusive control of the employer and, due to the rough and rugged lay of the land, travel upon the road was dangerous. Although in the cases above reviewed the vehicles were ordinary private automobiles or motor trucks, in the case before us the conveyance was a bus which the plaintiff used exclusively for the purpose of transporting its workmen.

■■ Our analysis of *B. & H. Passmore M. & R. Co. v. New Amsterdam Casualty Co.*, supra, and *Lumber Mutual Casualty Insurance Co. v. Stukes*, supra, has persuaded us to the reasoning employed in the latter. We recognize, as Judge Phillips pointed out, that insurance policies, especially their exclusion clauses, must

be strictly construed against the insurer and that, since workmen's compensation legislation is remedial in character, it must be liberally construed in favor of the workingman. But when all of that has been done, the fact remains that policies such as the one before us are intended to grant employers no protection for injuries to their employees. Accordingly, the controlling issue is: at what point does an employee lose his identity as such and become absorbed in the general public. Until he has cast off his role as an employee and become merged in the general public, the policy affords his employer no protection against mishaps which may befall him.

It is easier in this case to decide the problem than to state with precision the rules which yielded the decision. In this case, the plaintiff still had the men under its control and within the facilities of its plant when the accident occurred. As long as the men were upon the plaintiff's log truck road they were subject to the hazards of their daily work. If the men desired to continue their contracts of employment, there was no practical way in which they could escape the hazards of the crummies and none in which they could avoid the log truck road. The men rode in the crummies as an incident of their contract of employment. While they were being transported upon the log truck road they were exposed to dangers which the public did not encounter, for the members of the public were excluded from that road.

We have encountered no decision which endeavors to disclose any difference in meaning between "engaged in the employment" and "arising out of and in the course of his employment." The practical affairs of life, according to our belief, would gain nothing of consequence if a court should undertake to discover

a difference in the connotation of these two groups of words. We do not believe that the Passmore decision holds that the two terms actually differ in meaning, but indicates that courts, in determining whether a workman was "engaged in his employment", are more inclined to answer "no" than when they inquire whether he was engaged "in the course of his employment." The difference is one of judicial attitude rather than one of difference in phraseology. The difference has its origin in the fact that in the one case a contract of insurance is the subject of attention and in the other an item of remedial legislation. We can see merit in the distinction. In all other respects we embrace the Lumber Mutual opinion.

It will be recalled that the Passmore decision said: "Under certain particular situations there would be no doubt that the employee either was or was not engaged in the business of his employer." Possibly those words foresaw a situation of the kind which is before us. It is obvious that the facts in the Passmore case and in the one at bar are materially different. The exemption clauses are similar, but otherwise the cases are different.

■ It seems clear that the plaintiff could not have carried on its business without providing a means whereby the workmen could reach the place of their labors and at the close of the day return to their dwellings. Transportation for the workmen was vital to the plaintiff's operation and, in lieu of constructing a road upon which its workmen could operate their own cars, it was incumbent upon the plaintiff to haul its men back and forth. Provision for the carriage of the men was no less essential to the plaintiff's operations than the log trucks which hauled the logs from

the woods to the market. The crummies were as much an integral part of the plaintiff's plant as the log trucks and the log truck road. We are satisfied that transportation for the men was an incidental, if not an express, term of the contract of employment between the plaintiff and its employees.

When the men entered the busses in the morning and returned to them at the termination of the day's labors, they did so because of the terms of their contract of employment. Unless they rode in the busses, no timber would be cut. As we have said, the busses were, for all practical purposes, a part of the plant. They played their role in the production of logs. At the time of the unfortunate accident, the men, according to our belief, were engaged in their employment because (1) they were the plaintiff's employees; (2) they were still in the plaintiff's plant; (3) they were still under the plaintiff's control; (4) they were doing something which was essential to the plaintiff's operations; and (5) their presence in the bus was, for all practical purposes, a condition of their contract of employment.

We find no merit in the assignments of error under consideration. Since we have taken that position, it is unnecessary to set forth our consideration of the other assignments of error.

The decree of the circuit court is affirmed. Costs and disbursements will not be allowed.

ON REHEARING

IN BANC

*William E. Walsh,* of Coos Bay, and *Howard K. Beebe,* and *Maguire, Shields, Morrison & Bailey,* of Portland, for the petition.

*Black & Kendall,* of Portland, and *McKeown & Newhouse,* of Coos Bay, attorneys for respondent.

TOOZE, J.

The plaintiff, I-L Logging Company has filed a petition for rehearing which, omitting formal parts, reads as follows:

"1. The opinion herein is a complete and radical departure from and abandonment of the well-established rules of construction heretofore applied by this Court in the construction of insurance policies.

"2. The construction placed by the Court upon the ambiguous language of the insurance policy issued by respondent is prohibited by the statutes of this State.

"3. The Court overlooked and failed to apply the rule that where courts of high standing have placed a construction upon an insurance policy adverse to that contended for by the insurer and the insurer continues to issue the policy unchanged, the insurer must be deemed to have adopted such adverse construction as a part of the policy.

"4. The Court overlooked and failed to apply its own rule that where courts have differed as to the meaning of language in an insurance policy, ambiguity exists as a matter of fact and of law and such ambiguity must be resolved in favor of the insured.

"5. (a) Though the Court rejected the reasoning of Judge Parker in Lumber Mutual Cas. Co. v. Stukes insofar as it was based upon the reasoning and authority of workmen's compensation cases; the Court, nevertheless, applied step by step reasoning identical with the reasoning of such cases.

(b) The opinion herein and the application of such reasoning reversed the rule that the insured is entitled to as favorable a construction

as good conscience will permit and applies instead a rule, heretofore unheard of in the law, of strict construction against the insured and of extremely liberal construction in favor of the insurer.

"6. The Court erred in fact and in law in holding that appellant had control over the employees riding in the bus. The record affirmatively shows that appellant had no control over them in the sense that an employer has the right to control his employees.

"7. The effect of the erroneous decision herein is that:

"(a) Though appellant was endeavoring to secure full insurance coverage, it actually was not protected either under respondent's policy or the Lloyd's policy.

"(b) Many Oregon employers (and employees) in similar circumstances are deprived of any insurance coverage whatsoever because under the opinion herein the 'standard' policy issued by respondent is not applicable, and 'standard' employer's liability policies issued by Lloyd's clearly afford no coverage."

Plaintiff has also filed an extensive brief in support of its petition. However, a careful review of that brief has failed to disclose any important point in the case that was not fully argued by counsel and carefully considered by the court upon the original hearing.

We refrain from restating the facts in the case, because they are fully set forth in our original opinion which was handed down July 13, 1954.

Before giving attention to the several assignments of error set forth in the petition for rehearing, we wish to take note of what plaintiff claims is the effect of our decision, as set forth in subdivisions (a) and (b) of paragraph 7 thereof.

We have held, of course, that under the facts of this case, plaintiff was not protected under defendant's policy of indemnity insurance. As to whether it was protected under Lloyd's policy is of no importance in this particular litigation. Plaintiff rejected the contribution and compensation features of our Workmen's Compensation Act, as it had a right to do. In its relations with its employes, it sought protection elsewhere. The sort of protection it received is its own problem; that is one of the hazards it assumed when it rejected the Act. It has no bearing whatever upon the interpretation that should be given to the provisions of the public liability policy issued by defendant; and what is said with reference to plaintiff applies to all other employers similarly situated. It might well be pointed out that if these employers are unable to secure the coverage they desire from Lloyd's or some other indemnity company, the doors to the Workmen's Compensation Act always remain open to them.

Moreover, the record before us reveals that we need give ourselves no concern over the alleged plight of plaintiff. The statement that "it actually was not protected * * * under * * * the Lloyd's policy" does not accord with the facts, viewed from a practical standpoint. We quote from plaintiff's opening brief on the appeal to this court, commencing on page 6 thereof, the following:

"Between July 21, 1947, and November 4, 1947, twelve actions were commenced against appellant on account of the injuries to and deaths of employees who were in the crash (Defts. Exs. 4-15; Resp. Ab. 3-5). Since appellant had rejected the Workmen's Compensation Law (Ab. 5, 15, Tr. 74), the matter was referred by appellant to its attorneys, Maguire, Shields, Morrison & Bailey (Tr.

128). In September, 1947, appellant tendered the defense of said actions to certain underwriters at Lloyd's, London (Tr. 142), who had issued an employer's liability policy to appellant (Deft. Ex. 3). A question was raised as to whether the Lloyd's policy covered (Tr. 151-2), and the total potential liability was more than the potential coverage from that source, so Lloyd's counsel, Messrs. Senn and Recken, and appellant's attorneys appeared upon the pleadings and at the trial of the Sidney Sparkman case (Tr. 140, 147, 151-2; Defts. Exs. 4-15). Because of the question of whether Lloyd's policy covered, the concern of appellant's counsel over potential uninsured loss, and the fact that Underwriters' counsel and appellant's counsel had reached an opinion concerning respondent's liability (Tr. 145-6, 151-2) *an agreement was made whereby the Underwriters would loan appellant up to $100,-000.00, repayable only out of funds recovered from respondent, to dispose of the cases against appellant* (Tr. 146-8, 157). Execution of the formal instrument (Pl. Ex. F) was postponed until all cases had been settled, so that the exact amount of the loan could be incorporated therein (Tr. 148-9). The actual agreement was made before disposition of any of the cases against appellant had been effected (Tr. 148, 157).

"It is admitted (Tr. 50; Ab. 16) that the judgment on the verdict in the Sparkman Case (Deft. Ex. 7) had been satisfied by the payment of $1,187.75; and it was established by uncontradicted and undisputed evidence that the balance of the cases were compromised and settled for a total of $114,500.00 (Tr. 42-45, 112, 155; Pl. Exs. E, G, H, I, J, K, N). All cases were dismissed with prejudice (Ab. 17; Deft. Exs. 4-15)." (Italics ours.)

Under Lloyd's policy the limit of liability was $100,000 with a deductible of $5,000, on each disaster. The policy is entitled: "WORKMEN'S COMPENSATION (EXCESS SELF-INSURERS) POLICY."

Thus it appears that Lloyd's did indemnify plaintiff under the terms of its policy. Manifestly, the "loan" feature of the dealings between Lloyd's and plaintiff was more or less a pure fiction. It was simply a contrivance to enable plaintiff, in its own name, to maintain this action against defendant. Plaintiff has nothing to win or lose by our decision. It is a nominal party only. The real party in interest (not in the sense that it could or should be the plaintiff here) is Lloyd's, London. It, and not the plaintiff, must suffer the effects of our decision. It is significant that Lloyd's was willing to pay $100,000 indemnity under its policy. That is a substantial sum of money; not a nuisance payment. It is a matter of common knowledge that Lloyd's lacks much of being a philanthropic institution. It is obvious that its motives in shouldering liability in this case were not guided by a spirt of benevolence. Whether, as a matter of law, it was liable under its policy is not before us for decision; but its actions, which speak louder than words, indicate its own belief that under its policy liability attached. It is, of course, plain that its policy was procured and intended as a substitute for the rejected provisions of the Workmen's Compensation Act.

On the other hand, a mere reading of defendant's policy will clearly reveal that it was procured and issued for an entirely different purpose. The policy is, as its title indicates, a public liability policy, and its terms are standard for that type of insurance. Its aim is to indemnify the insured against claims for damages by members of the public generally, as distinguished from claims for damages by employes arising out of the employment relationship. In speaking of the employment relationship, we do not use the term "employment" in its broadest sense, nor did we so use

it in our former opinion. On the contrary, we use it in its well-established, restricted sense,—in the sense that it is used in cases arising under an Employer's Liability Act, under a Workmen's Compensation Act, under insurance policies such as we have here, and in situations involving the doctrine of respondeat superior. It is most significant that the exclusion clause in defendant's policy expressly excludes liability for claims by employes for which the insured might be held liable "under any workmen's compensation law".

We now give attention to the specific grounds for a rehearing as assigned by the plaintiff. We preface our discussion by again quoting the exclusion clause of defendant's policy:

> "(a) bodily injury to or sickness, disease or death of any *employee* of the Insured *while engaged in the employment of the Insured,* other than a domestic employee, or (b) *any obligation* for which the Insured or any company as his insurer may be held liable *under any workmen's compensation law.*" (Italics ours.)

It is plaintiff's contention that the phrase "while engaged in the employment of the Insured" is ambiguous. It argues that such ambiguity exists as a matter of fact and of law because certain courts, according to plaintiff, have differed as to the meaning of the same or equivalent language in insurance policies similar to that issued by defendant in this case. In support of that contention it cities the case of *Purcell v. Wash. Fid. Nat. Ins. Co.,* 146 Or 475, 486, 30 P2d 742, and quotes from the opinion of Mr. Justice ROSSMAN as follows:

> "Although the defendant contends that the policy is free from any ambiguity, it admits that clauses similar to the one under consideration have received

constructions 'tending to support respondent's views' by the United States Circuit Court of Appeals for the Third District, and by the Supreme Courts of Arkansas, Colorado, Texas and Washington. Before reviewing the decisions of those jurisdictions, we add that the defendant contends that the weight of authority supports its view. Defendant's admission that the foregoing jurisdictions have placed upon policies of the character written by it constructions adverse to its position is deserving of more than passing notice. The policy before us was sold September 29, 1926, and, no doubt, its phraseology is the product of skilled lawyers in its employ who were familiar with the decision of the courts. The Arkansas, Colorado and Federal decisions to which defendant makes reference, and which we shall in a moment review, were in the published reports long before this policy was sold to the plaintiff. The Texas decision was announced in 1927, but Southern Surety Co. v. Diercks (Texas Civil Appeals), 250 S.W. 755, the progenitor of the case cited by the defendant, was decided in 1923. *Thus, when the defendant wrote this policy it knew of the construction which courts of high standing had placed upon the phraseology which it selected. If there are decisions in conflict with those which we are now mentioning, then an ambiguity exists, and, under the rules aforementioned, the plaintiff must be given the benefit of the doubt.* (Italics ours.)

The foregoing must be read in the light of the facts and circumstances existing in that case and, specifically, in the light of the particular provisions of the insurance contract there involved. In that case it appeared that the particular provision of the insurance policy under consideration had been construed by quite a number of state courts of last resort. In the instant case, however, it appears that the language of the exclusion clause now being considered, or similar lan-

guage, had been construed by only four courts prior to the issuance of defendant's policy; viz., (1) by the U. S. Cir. Ct. of App., 5th Cir., in May, 1939: *Johnson v. Aetna Casualty & Surety Co.*, 104 F2d 22 (unanimous decision); (2) by the Supreme court of Kansas, in December, 1939: *Elliott v. Behner* (Casualty Co. of Dallas, Texas, Garnishee), 150 Kan 876, 96 P2d 852 (two judges dissenting); (3) by the U. S. Cir. Ct. of App., 8th Cir., in July, 1943: *State Farm Mut. Automobile Ins. Co. v. Brooks,* 136 F2d 807 (unanimous decision); and (4) by the U. S. Cir. Ct. of App., 10th Cir., in January, 1945: *B. H. Passmore Metal & Roofing Co., Inc. v. New Amsterdam Cas. Co.,* 147 F2d 536 (three judges participating, one dissenting). In the first case decided, i.e., the Johnson case, the court construed language similar to that in question here contrary to plaintiff's contentions in this case, and as we construed it in our former opinion. The third case, i.e., the Brooks case, followed the same rule announced in the Johnson case, citing the Johnson case as an authority for its position. In the Passmore case, which followed in point of time both the Johnson and Brooks cases, the court arrived at a conclusion seemingly in keeping with plaintiff's claim in this litigation. The court, in the body of its opinion, noted the decision in the Brooks case and apparently attempted to distinguish it on the facts, although its statement of the facts in that case appears to have been in error. In the Brooks case, *the boys were being transported to their home* when the accident occurred, and *not to another place of work* to perform additional duties, as Judge Phillips stated. Also, in the body of its opinion in the Passmore case, the court ignored the holding in the Johnson case. However, in passing, we note with

interest note 9 appended to the Passmore decision, found on page 539 of 147 F2d, and reading as follows:

"Johnson v. Aetna Casualty & Surety Co., 5 Cir., 104 F2d 22, 24, relied on by the Casualty Company, is distinguishable from the instant case. There, the policy excluded from the coverage 'any obligation for which the insured may be held liable under any workmen's compensation law.' The court held that the employee, while riding in a conveyance furnished by his employer from the place of work to his home 40 miles distant, was injured in the course of his employment, and, therefore, he was entitled to benefits under the Workmen's Compensation Law and the accident was excluded from the coverage of the policy. Here, the question is, was Little at the time of the accident engaged in the business of his employer?"

At first glance, the Elliott decision by the Kansas court would seem to support the claims of plaintiff relative to the construction that should be given the provision of defendant's policy with which we are concerned. Yet, a close analysis of the opinion in that case raises a serious question as to whether it is authority for or against plaintiff's position. We shall later point out some rather significant features of that opinion.

However, it is highly questionable that the diversity of opinion shown in the four cases mentioned established an existing ambiguity in the language employed in the policy as a matter of fact or law within the meaning of the rule as stated by Mr. Justice ROSSMAN. Decisions rendered by several courts of last resort since the instant policy was issued may have the effect of establishing such ambiguity within the meaning of the rule. Yet, when all is said and done, conflicting conclusions by a number of courts is only evidence of am-

biguity. It is not necessarily conclusive. The rule is stated in 13 Appleman, Insurance Law and Practice, 105, § 7404, as follows:

"* * * The very fact that a number of courts have reached conflicting conclusions as to the interpretation of a certain provision is frequently considered evidence of ambiguity. Conversely, if the terms of the policy have a clear meaning by judicial decision, it can scarcely be said that they are ambiguous, so as to bring into effect the rule of strict construction."

The rule announced by Mr. Justice ROSSMAN is a sound rule and ordinarily is applied when necessary under circumstances such as existed in the Purcell case. The fact remains, nevertheless, that it is but one of the many secondary rules for the construction of insurance contracts that have been established by court decisions, and, like most other rules of construction, depends for its application and effect upon the particular facts before the court. *Stewart v. Continental Cas. Co.*, 141 Wash 213, 250 P 1084, 49 ALR 960, and note.

■ However, it must be borne in mind that the primary and governing rule for the construction of insurance contracts, as of all other contracts, is to ascertain and declare the intention of the parties. In applying this rule, the contract must be considered as a whole, and, in some instances, resort may be had to extrinsic circumstances attending the execution of the agreement. All other rules of construction are secondary and are designed for the purpose of aiding in the application of the primary rule. In 13 Appleman, Insurance Law and Practice, 29, § 7385, it is said:

"It has been stated that the polar star of construction of an insurance contract is the intention

of the parties, and it is the duty of a court, if possible, to ascertain and apply that intention, regardless of whether the result is favorable to one party or another, applying the principles of construction previously examined. All other rules of construction are subservient to this."

In 13 Appleman, Insurance Law and Practice, 11, § 7383, it is further stated:

"It has been stated that a contract of insurance, being the law between the parties, should have every stipulation construed as written. It being presumed that every condition was intended to accomplish some purpose, it is not to be considered that idle provisions were inserted. Each word is deemed to have some meaning, and none should be assumed to be superfluous. All portions of a policy should be considered in construing it. * * *.

"It has been stated, therefore, that a court will look to the entire instrument and all of its provisions to ascertain its meaning, and will construe it as a whole or in its entirety. * * * The entire context and subject matter of the contract of insurance will be considered in determining the meaning and application of specific words and expressions. Nor will any insurance policy be considered ambiguous merely because a word or phrase, isolated from its context, is susceptible to more than one meaning, or because, in its context, it is susceptible to one reasonable and one unreasonable meaning.

"*The courts will, rather, take into consideration the apparent object or purpose of the insurance, in making its construction, and may consider, along with the context of the policy, the subject matter of insurance, the situation of the parties, and the circumstances surrounding the making of the contract.*" (Italics ours.)

There is no court-made rule of construction applying to insurance contracts that is binding upon us to the extent that in every case coming before us we are re-

quired to close our eyes to the particular factual situation involved, to abandon our own reasoning powers and ignore precedents established by prior decisions of this court, and to blindly follow a path some court of a foreign jurisdiction may have followed, or adopt a narrow and strained interpretation of the language employed in the contract simply because such an interpretation might be favorable to an insured.

For the purposes of this case, it may be conceded that the phrase ''while engaged in the employment of the Insured'', as used in the exclusion clause, is ambiguous, in the sense that we are called upon to specify with distinctness its meaning. In our former opinion we endeavored to make it clear that in our judgment the language employed in defendant's policy has the same meaning as the phrase ''arising out of and in the course of employment'', as used in our Workmen's Compensation Act. That conclusion was reached after thoughtful consideration and was deliberately stated. We find no reason for altering our position in that respect. However, from our concession of ambiguity in the sense mentioned, it does not necessarily follow that, under the rule that ambiguous language in an insurance contract should ordinarily be strictly construed against the insurer and liberally in favor of the insured, we are bound to adopt the construction urged upon us by plaintiff: that it means that the employe must be actually engaged in performing the particular work which he is paid to perform. The rule itself is a court-made rule; it does not have a specific statutory basis. It is a rule that is applied when the particular facts of a case warrant its application and when such application will lead to a sound conclusion. ORS 42.260, cited by plaintiff in support of its contention that the rule mentioned has a statutory basis, does not

specifically apply to insurance contracts; it is a general statute which on its face shows that in any given case its *application* depends upon *the particular facts* involved. That statute provides:

"When the terms of an agreement have been intended in a different sense, by the parties, that sense is to prevail, against either party, in which he supposed the other understood it. When different constructions of a provision are otherwise equally proper, that construction is to be taken which is most favorable to the party in whose favor the provision was made."

■ However, we do not wish to be understood as deviating in the slightest degree from the firmly-established rule in this state that where the construction of an insurance policy containing ambiguous language is involved, the provisions should be liberally construed in favor of the insured. Nevertheless, as indicated, the rule must be considered in the light of other equally well-established rules of construction, and, particularly, in the light of the primary rule above stated. Its application must lead to a sound conclusion under all the facts and circumstances in issue.

The plaintiff argues that defendant's policy was issued after certain courts had construed the clause in question unfavorably to defendant's present contention, and that it might well be considered that the policy was issued with that construction upon it. Plaintiff states:

"Under the well settled law of Oregon the policy will be construed as in the cases decided BEFORE the policy was written and not in accordance with those decided afterwards; the latter decisions merely demonstrate the existence of an ambiguity and the assured must be given the benefit of the construction most favorable to him."

Substantially the same argument was made upon the original hearing. In support of its claim that the wording of the exclusion clause in defendant's policy had been construed unfavorably to its contention in this case prior to the issuance of the policy under consideration, plaintiff then cited, and again cites, two decisions: the Passmore case, and *Elliott v. Behner,* supra. We previously stated that we would discuss the Elliott case. True, we discussed it in our former opinion, but inasmuch as there is one phase of the decision to which we did not give detailed attention, we will now supply that omission.

The case of *Elliott v. Behner,* supra, upon which plaintiff relies, was a sequel to the case of *Elliott v. Behner,* 146 Kan 827, 73 P2d 1116. In neither case was the Workmen's Compensation Law involved directly or indirectly. The facts in that case were entirely different from the facts in the instant case, as we pointed out in our former opinion.

The exclusion clause of the policy in the Kansas case read:

"* * * because of Bodily Injury to any employee of the Assured (except household servants other than chauffeurs) *while engaged in any business or occupation of the Assured* * * *." (Italics ours.)

In construing the phrase "while engaged in any business or occupation of the Assured", and to determine what it meant, the Kansas court very properly resorted to a consideration of what it deemed to be a somewhat similar provision in its state Workmen's Compensation Act and its own decisions with reference thereto. Referring to the language used in the exclusion clause, it said (at page 856 of 96 P2d):

"*There is language something like that in this contract in G.S. 1935, 44-501, the workmen's com-*

*pensation act.* That section reads, in part, as follows:

" 'If in any employment to which this act applies, personal injury by accident arising out of and in the course of employment is caused to a workman \* \*.' .

"This court has held that an injury must 'arise out of' and happen 'in the course of' the employment in order for the workmen's compensation act to apply. See Rush v. Empire Oil & Refining Co., 140 Kan. 198, 34 P2d 542, 543, and cases cited. There this court said:

" 'Did the accident which caused plaintiff's injury arise "out of" his employment? Even when other conditions exist, authorizing the award of compensation, it is essential that the accident which causes injury to the employee arise "out of" and "in the course of" his employment. \* \* \* Both conditions must exist. Bevard v. Coal Co., 101 Kan. 207, 208, 156 P. 657; Haas v. Light & Power Co., 109 Kan. 197, 203, 198 P. 174. The terms are not to be confused. They mean separate things. "In the course of" employment simply means while the employment was in progress. Cox v. Refining Co., 108 Kan. 320, 195 P. 863, 19 A.L.R. 90. Those words point to the time, place, and circumstances under which the accident took place. State Highway Commission v. Saylor, 252 Ky. 743, 68 S.W.(2d) 26. *Applying these authorities to the accident which caused claimant's injury in this case, there is no difficulty in saying that the accident arose "in the course of" his employment. But that is not enough. It is essential also that it arose "out of" the employment. \* \* \*'.*

"It is not enough that the person injured by [sic] an employee of the assured for this clause to exempt the garnishee from liability, the injury must also have happened while the injured man was engaged in the business or occupation of the assured.

Elliott was not so engaged when the accident occurred." (Italics ours.)

Before discussing the law of the case as noted, the Kansas court had stated (page 855):

"Garnishee argues that Elliott was an employee engaged in the business or occupation of the assured, that is, the county, when he was killed and on this account is not liable under the policy on account of his death. *The answer to be given depends upon whether under the facts and circumstances of this case Elliott at the time he was killed was an employee* of the assured *and engaged in the business or occupation of the assured.* \* \* \*.

"\* \* \* \* \*

"\* \* \* In this case Elliott had finished eight hours work for the county. *The trip home in the truck was no part of his employment. He paid nothing for it and could ride in the truck or not as he saw fit.* He was performing no service for the county when thus riding." (Italics ours.)

Under the facts in that case it is clear that the fatal accident did not "arise out of" Elliott's employment, as that term is ordinarily construed and applied in Workmen's Compensation cases. That, in substance, is what the Kansas court said. It based its ultimate conclusions upon the particular facts with which it had to deal. But it is significant that it grounded its final decision as above quoted upon the discussion immediately preceding respecting the Workmen's Compensation Act.

As authority for its claim that "an insurance company which continues to employ a clause which has been construed unfavorably to its present contention may well be considered to have issued the policy with that construction upon it, or to have adopted it", plaintiff cites three cases: *Fidelity & Casualty Co. v. Lowen-*

*stein,* 97 F 17, 19; *Prudential Ins. Co. v. Harris,* 254 Ky 23, 70 SW2d 949, 953-4; *Stanley v. American Motorist Ins. Co.,* 195 Md 180, 73 A2d 1, 4.

In the Lowenstein case the court said:

"The defendant company issued the policy in suit, * * *, after it was advised by the decisions to which reference has been made, *one of which was a construction of its own contract,* that, *as interpreted by the courts of last resort in several states,* the policy as drawn would not exempt it from liability * * *. * * * We are unwilling to concede that an insurance company may continue to issue policies without any modification of their terms, after certain provisions thereof have been construed by several courts of the highest character and ability, and be heard to insist, in controversies bebetween itself and the insured with respect to such subsequently issued policies, that they do not in fact cover risks which they had been judicially adjudged to cover before they were issued." (Italics ours.)

In the Stanley case the Maryland court said:

"* * *. * * * parties who adopt an insurance policy, which apparently has had nationwide use and has been judicially construed in five or six states, adopt with it the *uniform judicial construction* that it has received in other states." (Italics ours.)

The Kentucky court spoke as follows in the Harris case:

"* * * For twenty years and more this rule of construction has been consistently applied, and every insurance policy of this character issued in the state during that time has been with the knowledge that their terms would be so defined by the courts. If the insurance companies have not been altogether satisfied, we are aware of no reason

why a more explicit limitation could not have been incorporated in the policies. * * *.

"So it may logically be said that the contracts have been entered into with the understanding by both parties that their legal meaning is as indicated. It is not merely the age of a rule nor the frequency of its application that gives stability, for error is not less error because it has perhaps become gray with the years or smooth with use. But, when contracts have been made under the authority of *a consistent judicial course of construction,* it should be a very compelling situation that would warrant a change which would adversely affect rights acquired under that policy." (Italics ours.)

■ The rule announced by the above courts is certainly a sound rule, but it is manifestly inapplicable to the situation in this case. Prior to the issuance of defendant's policy, it had not been directly construed by any court. Neither had the language of its policy, nor similar language, been given "uniform judicial construction" by courts in five or six states, nor had there been "a consistent judicial course of construction" respecting it. On the contrary, only two courts at most had construed the language favorably to plaintiff's contention; whereas two other courts had definitely taken the opposite view. In such circumstances it is doubtful that any court would apply the rule contended for by plaintiff. We refuse to do so.

■ As previously noted, we held in our former opinion that the phrase "while engaged in the employment," as used in defendant's policy, has the same meaning as the phrase "arising out of and in the course of the employment", used in Workmen's Compensation Acts. We again so hold.

It is a well-settled general rule, that an injury sustained by a workman in going to or from work does not

arise out of and in the course of his employment. However, several exceptions to that general rule are equally well settled. These exceptions were firmly established by many decisions of courts of last resort in many states, including our own, long before defendant's policy was issued in this case, and, adopting plaintiff's own argument and the authorities it cites, defendant's policy may and should be read in the light thereof.

An employer may agree, either expressly or impliedly, that the relationship between himself and his employe shall continue during the period of "going to and coming from" the actual job site, in which case it is generally held that an accidental injury sustained by the employe while "going or coming" is one that "arises out of and in the course of the employment". This is particularly true where, as here, the employer furnishes transportation to and from the work as a necessary part of the contract of employment. The same situation may arise when an employer, as a part of the contract of hire, pays the workman an extra sum of money to cover the cost of transportation, or where the employer compensates the employe for the period of time required in going to or from the work. Each case is decided upon its own facts. There is no fixed rule decisive of all cases. The record in the instant case supports a conclusion that the transportation furnished by the employer was expressly made a part of the contract of hire and was a necessary incident thereof. Such transportation was the only practical means of getting the workmen to and from the job site. *Livingston v. State Ind. Acc. Com.,* 200 Or 468, 266 P2d 684, 13 NACCA LJ 27; *Lamm v. Silver Falls Timber Co.,* 133 Or 468, 277 P 91, 286 P 527, 291 P 375; *Serrano v. Ind. Comm.,* 75 Ariz 326, 256 P2d 709; *Kobe v. Ind. Acc. Com.,* 35 Cal2d 33, 215 P2d 736; *Voehl v.*

*Indemnity Ins. Co. of North America,* 288 US 162, 53
S Ct 380, 77 L ed 676, 87 ALR 245, and note commencing
at page 250, *Gettlin v. Maryland Cas. Co.,* 196 F2d 249.

■ It would seem axiomatic that a workman is en-
gaged in his employment at all times while he is doing
something for the benefit of his employer, pursuant to
his contract of hire. That "something" does not neces-
sarily mean the actual swinging of the axe, the opera-
tion of the donkey, the handling of the lumber on the
green chain, or other activity for the performance of
which one is employed. It may include other things.
When transportation to and from the job site is neces-
sarily furnished by the employer as a part of the con-
tract of employment, and, as here, to further the busi-
ness of the employer, there can be no question but that
the workmen are engaged in the duties of their em-
ployment from the moment they enter the bus (or
other means of transportation) provided by the em-
ployer for that purpose until they are discharged
therefrom at the end of the day's work. It is immaterial
that the workmen also benefit from the transportation.
Under the facts and circumstances of this case, it is
obvious that from the moment the workmen entered
the bus and transportation began, their movements
were controlled by the employer; they had no control
over the operation of the vehicle, nor did they have
the right to direct it. That was exclusively the business
of the employer.

It is manifest that our previous decision is not
wrong unless we now find ourselves caught in a plight
which compels us to embrace the Passmore decision,
even though the careful consideration we gave to it
when we wrote our original opinion caused us to reject
the holding in that case. The petition for a rehearing
does not contend that the Passmore decision was cor-

rectly decided and that it is harmonious with our laws and previous decisions, but insists that this court and all other courts confronted with cases like this one have been caught in a vise which forces them to adopt the Passmore holding.

The petition for a rehearing is based upon the premise that if a court anywhere has construed a provision in an insurance policy favorably to the insured, thereupon all other courts which subsequently construe a similar provision must follow it. The latter becomes the bellwether for the flock, and all subsequent courts must follow in lock step. They can engage in no reasoning process: "Their's not to make reply, Their's not to reason why, Their's but to do and die."

Under the rule which the plaintiff asks us to follow, our previous decision would be correct if Judge Parker had pronounced his decision in *Lumber Mutual Casualty Ins. Co. v. Stukes,* 164 F2d 571, a day or so before the defendant issued its policy to plaintiff, but, since he did not do so, we must reverse our previous decision and follow, willy-nilly, the decision written by Judge Phillips. Thus, we are asked to decide this case upon a timetable basis. But following plaintiff's own argument, the Passmore decision is clearly erroneous because it did not adopt the interpretation placed upon the phrase in question in two prior cases: *Johnson v. Aetna Casualty & Surety Co.* (the first case), supra; and *State Farm Mut. Automobile Ins. Co. v. Brooks,* supra.

It is too well established to require a buttressing with citations that every authority which is submitted to a subsequent court must be analyzed and appraised before it is accepted and followed. The principal elements which give an authority value may be summarized as follows: (1) Were the facts in cited case similar

to those in the case at bar? (2) Does the reasoning and the analysis which were employed in the cited case appeal to the court in the instant case as sound? (3) Was the question decided in the cited case the same as that before the court? and (4) Does the decision or the result which was reached in the cited case have a bearing upon the case being considered? In short, a decision is not controlling merely because it is a decision. The court to which it is cited must analyze and appraise it.

Even at the risk of some repetition, we turn again to the Passmore decision. In it Judge Phillips wrote: "It is true that if the accident had not resulted in Little's death he would have been entitled to benefits under the Workmen's Compensation Law * * *." That statement was made notwithstanding the fact that Little, the deceased employe, was under no compulsion whatever to ride in the truck. Passmore, according to the decision, furnished the vehicle "gratuitously". The truck was a small one and one-half ton Ford, which was used by Passmore primarily for the purpose of hauling materials and supplies to and from the places where his crew did their roofing work. The truck was driven daily, before working hours commenced, from Passmore's shop to the place of work, and at the close of the day's work, returned to the shop. Little and the other two men were afforded the privilege of riding in it. Usually they embraced the privilege, but at times they availed themselves of other means of transportation. The truck operated upon the public thoroughfares. Such were the facts in the Passmore case.

It is clear that if Little had been injured in Oregon and had sought workmen's compensation for his injury, compensation would have been denied him. In fact,

this court has so held more than once. Our latest pronouncement, *Livingston v. State Ind. Acc. Com.*, supra, quoted the following from an annotation in 87 ALR 245:

> " 'It is a general though not invariable rule, so common as to require no citation of authority, that an injury sustained in going to or from work does not arise out of and in the course of the employment within the meaning of workmen's compensation acts.' "

Our decision ruled as follows:

> "We hold that if an employer pays for the employee's time during his travel from the job site to his home, the relationship of employer and employee continues during that period of time, and an injury occurring during the course and, in particular, the time of such travel from accidental causes, arises out of and in the course of the employment, and is compensable."

From the language just quoted, we see that the Passmore case employed a view of the law contrary to the holdings of this court. In appraising the value of a precedent, all courts, before embracing or rejecting it, must determine whether or not the precedent employed principles of law adverse to the local holdings. Not only is the Livingston decision adverse to the Passmore statement ("If the accident had not resulted in Little's death he would have been entitled to benefits under the Workmen's Compensation Law"), but *March v. State Ind. Acc. Com.*, 142 Or 246, 20 P2d 227, is likewise adverse to that holding; so, also, is *Larsen v. State Industrial Accident Com.*, 135 Or 137, 295 P 195, in which we said:

> "Applying these principles to the facts of the instant case, it seems plain that plaintiff's injury neither arose out of nor in the course of his em-

ployment. He was not at the time at work or performing any duty which he owed to the master, nor was he doing any act to further his master's interests. He rode upon the platform for purposes of his own and, in doing so, he incurred a risk which was not incidental to his employment but which was shared in common by all members of the public who might use the platform for parking purposes."

In *Collins v. Troy Laundry Co.*, 135 Or 580, 297 P 334, the plaintiff, an employe of the Troy Laundry, had scarcely stepped out of the laundry to the adjacent public walk when she was injured through an obstruction upon the walk which was a part of the laundry's equipment. It was held that her injury did not arise out of and in the course of her employment.

In *Hopkins v. State Ind. Acc. Com.*, 160 Or 95, 83 P2d 487, the plaintiff, who was upon relief, was employed upon a Federal SERA project which was many miles from his home. Because the plaintiff lacked transportation, the foreman permitted him to quit work and start home early. While he was on his way and proceeding along a public highway, he was injured by a passing car. Our decision held that the injury did not arise out of and in the course of the employe's employment.

In *Lamm v. Silver Falls Timber Co.*, supra, and *Varrelman v. Flora Logging Co.*, 133 Or 541, 277 P 97, 286 P 541, 290 P 751, the injuries, unlike the one suffered in the Passmore case, did not occur upon a public thoroughfare, but upon the defendant's logging railroad. The distinction is material. When Little, Passmore's employe, was injured upon the public street, he was exposed to no dangers which the common public did not also face. But Lamm and Varrelman, who were injured while going back to the logging

camps, were exposed to dangers incidental to their employment which the public never encountered.

As we have seen, one of the elements which courts take into consideration in appraising the value of a precedent is whether it passed upon a question similar to the one at bar. The Passmore decision, in stating the question which it decided, defined it in these words: "a borderline case". Thus, anyone evaluating that decision is warned that the court which announced it deemed it "a borderline case". The warning is accented by the fact that the court at first decided it the other way and then reversed itself upon rehearing. The final decision reversed not only the previous one, but also that of the lower court. Further, Circuit Court Judge Bratton, who has had a long and distinguished career upon the bench, dissented.

The Passmore decision acknowledged that there were two federal decisions contrary to its holding. One of the two is *State Farm Mut. Automobile Ins. Co. v. Brooks,* supra; the other is *Johnson v. Aetna Casualty & Surety Co.,* supra.

From the foregoing, we observe that the Passmore decision employed a principle of law which is not recognized in this state. This court has more than once rejected it. That in itself is a material difference between the two cases. If an insured, who was offered a policy like the one before us, had consulted the Passmore holding in an effort to learn the meaning of a policy, he would have observed that the Passmore decision termed the case before the court as "a borderline case" and thereby would have been warned that the holding might not be repeated if the facts in the next case were different. Furthermore, he would have observed that the court had previously announced a different holding, and he would also have observed that

the decision which he was reading represented the views of only two of the three judges.

■ As we have observed, the holding in one case is never deemed controlling upon a subsequent case if the facts of the two cases are substantially different. The facts in the Passmore case and those in the one at bar are materially different: (1) In the Passmore case the truck which brought death to Little operated upon the improved public thoroughfares; whereas, in the case at bar, the "crummy" ran along a private hazardous road which was a part of plaintiff's premises; (2) in the Passmore case the transportation was furnished "gratuitously" and not as a necessary incident or term of the employment contract; whereas in our case the transportation was a term, or incident, of the employment and at times was a feature of the bargaining which took place between the plaintiff and the labor union; (3) in the Passmore case the plaintiff, upon laying down his tools and entering the truck, was no longer exposed to the hazards of his employment, but in the case at bar the workmen were exposed to the hazards of their employment at least as long as the crummy operated upon the logging road; (4) in the Passmore case Little and his coemployes were at liberty to ride in the truck or not as they saw fit, but, in the case before us, the employe had no choice. Accordingly, if the plaintiff, before procuring the policy of insurance which is before us, had envisioned the accident which actually later occurred and had then consulted the Passmore decision, it could not reasonably have inferred that the Passmore decision would be applicable to the accident.

As noted, the petition for a rehearing contends that the term "engaged in the business" is ambiguous and that we are, therefore, bound to place upon that term

the meaning which was adopted in the Passmore decision. Continuing, the petition argues that we are forced to ignore the purported meaning given to the same term by Judge Parker in *Lumber Mutual Casualty Ins. Co. v. Stukes,* supra. Let us pause upon that contention for a moment.

The Passmore decision said: "The word 'engaged' connotes action." Presently it turned to a decision and quoted from it the following: " 'Engaged' is defined in Volume III of Words and Phrases, Third Series, at page 258, as follows: 'Engage' means to take part in or being employed in, however, the employment may arise." *Lumber Mutual Casualty Ins. Co. v. Stukes,* supra, took no issue with a definition as commonplace as that. Referring to the facts of its own case, it pointed out: "Such transportation was a part of his contract of employment." Thus the transportation in that case, as in the one before us, but unlike the transportation in the Passmore case, "was a part of his contract of employment." It then continued:

" '* * * The case of Covington v. A.C.L.R.R. Co., 158 S.C. 194, 155 S.E. 438, cites with approval the case of Sanders v. Railway Company, 97 S.C. 50, 81 S.E. 283, and holds that an employee returning from his work by means of transportation furnished him for that purpose by the employer is still engaged in the discharge of the duties of his employment. While these cases were brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., the principle is the same, and is here applicable.' "

From the foregoing it becomes apparent that the difference in the results reached by Judge Phillips and Judge Parker did not come from assigning to the phrase, "engaged in the business" different meanings,

but largely from the circumstances that the facts of the two cases were different and that Judge Parker deemed that an employe, who was being transported. under the terms of his contract of employment, was engaged in his employment, whereas Judge Phillips believed that an employe, while riding through the courtesy of his employer, was not so engaged.

Despite the fact that some courts have apparently differed as to the proper construction that should be placed upon the phrase "while engaged in the employment of the Insured", it is true, nevertheless, that the differences stemmed from the particular factual situations involved, rather than from any real conflict upon legal principles. The phrase is couched in plain and understandable language; in language that has long been used in the law of agency and of master and servant. As a practical matter, it is dificult to look upon the language as ambiguous in the sense contended for by plaintiff. Throughout its brief on the petition for rehearing, in speaking of that phrase, and, in particular, when discussing a claimed ambiguity in the language used, plaintiff emphasizes the word "engaged". It pays but little attention to the remainder. The word "engaged" is a very simple word indeed, its meaning well understood. But it is obvious that it is not the key that opens the door to the plain meaning of the phrase itself. The gist of the clause is to be found in the words "in the *employment* of the Insured". When, from the facts of a given case, it is ascertained what is encompassed by the workman's "contract of employment", or, in other words, "what is the scope of his employment under the contract of hire", it then becomes a most simple matter to determine whether or not at a given time and place an employe was "engaged in", or "carrying on", his duties "within the scope

of his employment", pursuant to his contract with his employer. Unambiguous language cannot be made ambiguous by any argument of counsel or rule of law. This principle is well stated in *Terry v. New York Life Ins. Co.,* 104 F2d 498, 504, as follows:

"While the opinions of the courts holding the view, based upon the foregoing brief outline of their reasoning, that the clause is ambiguous command great respect, we cannot escape the conviction that they overlook and fail to consider the policy as a whole and to give to all the language used its apt and natural meaning. The rule that ambiguous clauses of an insurance policy are to be construed against the insurer can not be availed of to import into a contract a nonexistent ambiguity, to force unusual meanings from the language used, or to refine away terms expressed with sufficient clearness to convey the plain meaning of the parties."

Before concluding, we wish to take notice of another phase of this case that was not discussed in our former opinion.

Based upon the premise that the exclusion clause in defendant's policy contains ambiguous language, we are urged by plaintiff to resolve all doubts in favor of the insured and to go so far in giving the insured the benefit of doubts as good conscience will permit. In advancing those propositions, plaintiff evidently deems that a perpetual conflict exists between the insurer and the insured. It argues that the insurer is constantly loading its policies with clauses inimical to the insured. Thus, plaintiff's brief includes passages such as these: "the tricky and uncertain language used by 'calculating and astute experts' who hand out policies 'ready-made' which 'swarm' with intricate technical provisions"; "expert policy writer"; "a legal technician"; "the expert lawyers and draftsmen of the insurers * * *

with great craft and skill, using all acumen obtained through specialized education and experience''. As before stated, it is well established that when the insured and the insurer are two entities, doubts which stem from ambiguities are generally resolved in favor of the insured, but in the present instance, it appears that the insured and the insurer are one and the same.

According to the complaint, ''at all times mentioned herein defendant was and now is an unincorporated association whose subscribers engage in the business of inter-insurance''. Plaintiff is one of the subscribers, and is, therefore, one of the insurers. The attorney in fact who signs the policies, such as the one which plaintiff possesses, is located in Colorado, and the act under which the policies issue is found in Vol. IIIA, 35 CSA, ch 87, § 98. That Act provides: ''Individuals, partnerships and corporations of this state, hereby designated as subscribers, are hereby authorized to exchange reciprocal or inter-insurance contracts with each other, or with individuals, partnerships and corporations of other states and countries, providing indemnity among themselves for any loss which may be insured against under other provisions of the law, excepting life insurance, * * *.'' Oregon legislation of similar nature is contained in ORS 749.010 to 749.160.

Subsection (d) of § 98 of the Colorado statute provides: ''* * * the attorney shall file with the insurance commissioner an instrument in writing executed by him for said subscribers, conditioned that upon the issuance of certificate of authority provided for in subsection (k) thereof, action may be brought in the county in which the property thereunder is situated, and service of process may be had upon the insurance commissioner, or deputy commissioner, * * *.''

Thus, under the form of insurance involved here,

plaintiff was an insurer when it became an insured. In those circumstances, it is difficult to find any basis for the strictures in which plaintiff's counsel engage when they speak of "insurers". Moreover, it may be difficult to find any basis for the inferences, adverse to the "insurer", in which they ask us to indulge. *Rickel v. Republic Mut. Fire Ins. Co.*, 129 Kan 332, 282 P 757. However, we need not decide those matters in this case, but leave them open for future consideration when such consideration may become necessary.

We adhere to our former opinion. The petition for rehearing is denied.

LATOURETTE, C.J., and LUSK, J., concur in the result.