Argued March 17, affirmed April 13, petition for rehearing
denied June 1, 1960

WILLIAMS ET UX *v.* SWARTZ ET AL
350 P. 2d 1079

*William L. Josslin*, Portland, argued the cause and filed briefs for appellants.

*Francis E. Harrington*, Portland, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Perry, O'Connell and Duncan, Justices.

DUNCAN, J. (Pro Tempore)

Appeal from a decree in equity entered December 2, 1957, in the circuit court for Multnomah county, dismissing plaintiffs' suit. Plaintiff Ruth Schieve Williams is the surviving daughter of Adolph Schieve, hereafter referred to as Adolph, who died December 24, 1955. Plaintiff Guy E. Williams is the husband of Ruth, and they will be respectively referred to as Ruth and Guy. Defendant Harry E. Swartz, hereafter referred to as Swartz, was a nephew of Adolph and devisee and legatee of Mary Schieve, hereafter referred to as Mary, who died July 15, 1956. Defendant Elizabeth I. Swartz is the wife of defendant Harry E. Swartz.

On May 28, 1947, Ruth and Guy executed a deed in warranty form in favor of Adolph and Mary Schieve, husband and wife, conveying:

"East forty-five feet (E 45') of Lot five (5), Block twenty-seven (27), FEURER'S ADDITION TO EAST PORTLAND, in the City of Portland."

The deed was recorded on the same date. It bore revenue stamps in the sum of $2.75. A policy of title insurance for $2,500 was given to the grantees. Also on said date Ruth and Guy executed and delivered to said

grantees a bill of sale covering furniture and fixtures in the house. At the time of executing the instruments, Adolph paid $2,500 to Ruth and assumed a mortgage of $311.88 and some taxes, making a total of approximately $3,000. Mary Schieve left a will naming defendant Swartz as administrator with the will annexed.

Plaintiffs claim that the deed and bill of sale were pursuant to an agreement with grantees that the latter should own the property during their lives and that upon the death of the survivor of them the property should revert to Ruth. Plaintiffs claim that this agreement was omitted from the documents through mutual mistake of the parties to the deed and bill of sale. The suit seeks to reform the deed to show a life interest only in grantees and to have the property conveyed to Ruth and for an accounting for rents and for property disposed of.

Defendants denied the alleged agreement and alleged that grantees purchased the real and personal property and paid consideration therefor. Swartz further claimed an agreement with Mary Schieve whereby she was to will her property to Swartz in return for monies advanced by him to her.

During the opening statements in the trial court counsel for plaintiffs suggested the possibility of an estoppel against Mary resulting from statements allegedly made by her after the date of execution of the deed and bill of sale to the effect that Ruth would receive the property after Adolph and Mary were gone. It was counsel's contention that such statements were relied on by plaintiffs, with the result that they failed to take appropriate steps during Mary's life to protect their own interest. However, this is not deemed to constitute an estoppel, even though it may be admissible to explain the reasons for plaintiffs' delay. We con-

sider the suit as one to reform the instruments because of a mutual mistake of the parties.

Plaintiffs contend that the real property was worth approximately $5,000 when the deed was made and produced expert witnesses who so testified. It should be noted, however, that this estimate of value was not made from a personal examination of the property at the time of the deed but by relation back to that time from examinations made in 1957. The household furnishings were stated to be worth about $500 when transferred.

Mrs. Turner, called as a witness by both sides, had been a next-door neighbor of Adolph since 1946. She said the house was run down and had not been painted for many years, and the property was in an "awful state." She and her husband paid the expense of the painting of Adolph's house so its appearance would not cause "devaluation" of their property.

In the probate of Mary's estate the real property was appraised at $4,000 and the personal property at $114. One of the appraisers testified that this was the then market value.

Adolph and Mary were uneducated people with little business experience. Adolph could neither read nor write.

Ruth went through grammar school and for a short time to a polytechnical school, and also attended beauty school. She engaged in business, but unsuccessfully, in California and had been involved in some law suits. Guy had a reasonable amount of education and had substantial experience as a jewelry salesman.

Guy and Ruth were estranged for several years, and Ruth lived in California during that period. About the time of the transaction they were reconciled and

lived together in Salem but parted again soon after the conveyance was made. During this period Ruth was ill and in financial difficulties. She needed money for doctor bills; the property was mortgaged and subject to back taxes and a small judgment against Ruth. She wanted to convey the property to her father to protect it and to obtain money. She and Guy testified to several conversations with Adolph about it, and he later offered $2,500 for the real property. According to the testimony of plaintiffs, Adolph said that he and Mary would care for the home and that after they were gone Ruth would have the property. Guy told of discussions with Adolph and testified as follows concerning a conversation between him, Ruth and Adolph shortly prior to the execution of the documents:

"A So he brought up the fact again, he said, 'Now,' he was really worried, he said, 'You know you have an obligation on this house. You are back a couple of years in taxes. You are delinquent in a mortgage on the place.' He said, 'In your sickness,' my wife was sick at the time and spending money for hormones and gold shots and so on and so forth, and we needed monies for doctor's care for her. I didn't have it. He said, 'You need money for doctor and to preserve your health and take care of it.' He said, 'I will give you $2,500.00 and assume the burdens of the debts against this piece of property.' So we talked about it and Ruth said, 'Well, if that will make you happy and I can be assured and it will assure me of a home when you and Mary are gone, I would do that.' She says, 'I will give you life lease. You can have it any way you want it, dad. But if this is your suggestion, that you give me $2,500.00 so I can have some money on hand and you assume the debts and obligations of the property, if this will make you happy, we'll do it that way.' and that's the way it was done. It was at his suggestion."

The deed and bill of sale were prepared by attorney Walter Klein at Adolph's request. Attorney Klein did not recall the matter in detail but said he was not requested to insert any reservations in the documents. Ruth and Guy signed the documents in the attorney's office but said they did not read the papers before signing.

Mrs. Turner, the neighbor who painted the house, said that Adolph told her that Ruth had told him he could have a lifetime lease or could buy the property anyway he liked and that he said that either way he took it, the property would be Ruth's after he was gone. Mrs. Turner also said that later Adolph told her he had bought the property.

Guy testified that in September, 1955, in a conversation with Adolph he said to the latter "You have definitely got this arranged so that when you are gone Mary will have a life lease in the property and that it will go to Ruth after she, Mary, goes," and that Adolph answered: "Absolutely. Everything is taken care of."

Several witnesses for plaintiffs testified to remarks made by Adolph after the date of the deed to the effect that Ruth would have the property after he and Mary were gone. There was some testimony that Mary had made similar remarks.

Swartz testified that Adolph told him he had purchased the property and furniture from Ruth for $3,000. Other witnesses heard Adolph say he had "got a good buy."

The foregoing generally covers the evidence relied on.

■ It is the rule that reformation of an instrument may be had for mutual mistake or for an excusable mistake by one party, coupled with fraud on the part

of the other. *Dolph v. Lennon's, Inc., et al.,* 109 Or 336, 353-354, 220 P 161. No fraud is claimed in this case.

It is also the rule that to obtain reformation the evidence of a mutual mistake must be clear, definite, cogent and unequivocal and must show precisely what was intended by the parties to be contained in the instrument and that every presumption is to be invoked in favor of the correctness of the instrument. *Dolph v. Lennon's, Inc., et al.,* supra, at p 355.

The deed is presumed to state correctly the terms of the agreement. *Boyce v. Killip,* 184 Or 424, 455, 198 P2d 613. The transcript in this case contains over 500 pages of testimony and arguments. The trial judge, having the advantage of seeing the witnesses as well as hearing them, came to the conclusion that there was no mutual mistake involved and that the deed and bill of sale were an outright sale by plaintiffs to Adolph and Mary. We are convinced without seeing the witnesses that plaintiffs failed to prove their case and that the trial court arrived at the correct result.

The decree is affirmed.