FRED MEYER, INC., Plaintiff,

v.

CENTRAL MUTUAL INSURANCE COMPANY, Sun Insurance Office Ltd., Westchester Fire Insurance Company, American Home Insurance Company, Indiana Lumbermen's Mutual Insurance Company, Defendants.

Civ. No. 63–318.

United States District Court
D. Oregon.
Oct. 6, 1964.

George W. Mead, Portland, Or., for plaintiff.

Kenneth E. Roberts, of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., Long & Levit, Victor B. Levit, San Francisco, for defendant Central Mut. Ins. Co.

R. R. Bullivant, of Pendergrass, Spackman, Bullivant & Wright, Portland, Or., for remaining defendants.

KILKENNY, District Judge.

This diversity action is before the court on plaintiff's claims that defendant insurance companies are liable under certain insurance policies issued by them to plaintiff. The claims grow out of a loss of perishable food on October 12, 1962. The food spoiled at sprinklered locations in plaintiff's stores when a windstorm of hurricane force, destroyed electric power lines supplying the power to plaintiff's refrigeration facilities. The facts are practically undisputed. The wind, although damaging some of plaintiff's property, did not touch the foodstuffs.

Central Mutual (Central), issued to plaintiff a fire insurance policy, with extended coverage, insuring non-sprinklered store locations. It has paid plaintiff for loss of foodstuffs at those locations. Central also covers plaintiff's stores, both sprinklered and non-sprinklered, with a special all risk policy.

Defendants Sun Insurance, Westchester Fire, American Home and Indiana Lumbermen's (all referred to collectively as the Direct Damage Insurers), each issued a fire policy with extended coverage, insuring plaintiff's sprinklered store locations, including direct loss by windstorm.[1]

1. "STANDARD FORMS BUREAU FORM 202–NS (April 1962)

"EXTENDED COVERAGE ENDORSEMENT

"(PERILS OF WINDSTORM AND HAIL, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT, VEHICLES AND SMOKE)

"FOR USE ON ALL RISKS *OTHER THAN* DWELLING AND FARM PROPERTIES.

"In consideration of the premium for this coverage, and subject to the provisions herein and in the policy to which this endorsement is attached including endorsements thereon, THIS POLICY IS EXTENDED TO INSURE AGAINST DIRECT LOSS BY WINDSTORM, HAIL, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT, VEHICLES, AND SMOKE, EXCEPT AS HEREINAFTER PROVIDED.

\* \* \* \* \*

"UNLESS AN ADDITIONAL PREMIUM IS CHARGED AND THIS POLICY IS SPECIFICALLY ENDORSED TO PROVIDE FOR COVERAGE OF WINDSTORM AND HAIL DAMAGE,

Plaintiff submitted proof of its loss to each of the defendants and all have denied liability. Plaintiff argues that either the Direct Damage Insurers are liable under their extended coverage policies at sprinklered locations or that Central is liable under its special risk policy, which covers both sprinklered and non-sprinklered locations. This action, however, is concerned with sprinklered locations only. The Direct Damage Insurers contend that the language in their special endorsement "Direct Loss by Windstorm," does not encompass a loss where the wind did not physically strike the foodstuffs. Central takes the opposite view and also claims that its special risk policy was never intended to include fire and extended coverage perils at sprinklered locations. On the last point, it seeks reformation.

 I. The threshold question is whether plaintiff's loss is a "direct loss by windstorm," within the meaning of the fire and extended coverage policies issued by the Direct Damage Insurers. This being a diversity case, it is the court's duty to determine and apply the law of the state of Oregon. Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Tierney v. Safeco Ins. Co. of America, 216 F.Supp. 590 (D.Or.1963); Gilkey v. Andrew Weir Ins. Co., 291 F.2d 132 (9th Cir. 1961). The Supreme Court of the state of Oregon has not passed on the precise question, nor is there a published opinion of Oregon's other courts of general jurisdiction on this subject. However, the exact question has twice[2] been presented to the circuit court of the state of Oregon for Multnomah County, a court of general jurisdiction. Those decisions were announced by informal letter to counsel, followed by formal findings, conclusions and judgments in each case. The authority of Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940), holding that federal courts are bound by decisions of an intermediate court until the state's highest court has passed on the issue, is modified, to some extent, by King v. Order of United Commercial Travelers, 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608 (1948). There, as here, the court was considering the decision of a court whose opinions were not published. In the King case the court of appeals did not follow the unreported decision of the court of common pleas of the state of South Carolina and the United States Supreme Court held that the court of appeals was justified in holding that the action of the intermediate court was not controlling. A distinction of considerable significance exists between the court of common pleas of the state of South Carolina and the circuit court of the state of Oregon, in that the decisions of the former are not binding in the same court.[3] The recent Ninth Circuit case of Leh v. General Petroleum Corp., 330 F.2d 288 (9th Cir. 1964) adds little to the previous discussion. There, the Ninth Circuit, in passing on a decision of the Superior Court of California, reviewed the California cases, and held that the decision was of little precedential value. Since the two Oregon Circuit Court decisions are rather recent they cannot be afforded the value which would normally be attached to Circuit Court rulings which have been uniform for a

THIS COMPANY SHALL NOT BE LIABLE FOR WINDSTORM OR HAIL DAMAGE TO: (a) GRAIN, HAY, STRAW OR OTHER CROPS OUTSIDE OF BUILDINGS; OR (b) WINDMILLS, WINDPUMPS OR THEIR TOWERS; OR (c) CROP SILOS (OR THEIR CONTENTS); OR (d) METAL SMOKESTACKS OR WHEN OUTSIDE OF BUILDINGS, CLOTH AWNINGS, SIGNS, RADIO OR TELEVISION ANTENNAS INCLUDING, THEIR LEAD-IN WIRING, MASTS OR TOWERS; OR (c) LAWNS, TREES, SHRUBS OR PLANTS."

2. Hervin Co. v. General Ins. Co. of America (No. 290-569, January, 1964).
 Robertson v. General Ins. Co. of America (No. 290-546, January, 1964).

3. "In future cases between different parties, as indicated above, a Common Pleas decision does not exact conformity from either the same court or lesser courts within its territorial jurisdiction; * * *." 333 U.S. at 161, 68 S.Ct. at 493.

long period of time. State v. Stevenson, 98 Or. 285, 304, 193 P. 1030 (1920). It is my belief that decisions of the Oregon circuit courts, passing on the exact point, are of some importance, and although they are not controlling,[4] they have some persuasion in forecasting what the Oregon Supreme Court would say on the subject. It appears, from the record before me, that the causes before the circuit court of Multnomah County were ably argued, well briefed and decided after due deliberation.

Aside from the Oregon circuit court decisions, the only case precisely in point is Lipschultz v. General Ins. Co. of America, 256 Minn. 7, 96 N.W.2d 880 (1959). It was the progenitor of the result in the Oregon cases. The rationalization of the subject by Justice Nelson in Lipschultz, is in my opinion, on solid ground. The Minnesota court adopted the view that the words "proximate," "immediate" and "direct" are frequently used synonymously. Oregon takes the same view. Kuniholm v. Portland Elec. Power Co., 133 Or. 246, 289 P. 1055 (1930).

■ Although less apposite, the recent case of Travelers Indemnity Co. v. Jarrett, 369 S.W.2d 653 (Tex.1963), involves the same legal principle. There a bolt of lightning struck certain power lines leading to plaintiff's home, thus cutting the power to plaintiff's refrigerator. The food in the refrigerator spoiled with resulting damage to the unit. There the policy insured against "loss by lightning." In arriving at its conclusion, the court read the policy so as to include the word "direct" in the above quotation, and held that lightning was the immediate or proximate cause of the damage. Other authorities holding that "direct loss" means "immediate" or "proximate," as distinguished from "remote" or "incidental," and that the insured need only prove that the loss was proximately caused by the peril are Board of Commr's. v. Norwich Union Fire Ins.

Soc., 51 F.Supp. 245 (E.D.La.1943); Lynn Gas & Electric Co. v. Meridan Fire Ins. Co., 158 Mass. 570, 33 N.E. 690 (1893); 5 Appleman, Insurance Law & Practice §§ 3083 and 3142, and Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co., 256 Minn. 404, 98 N.W.2d 280 (1959).

Counsel for Direct Damage Insurers are of the belief that the decision in Lipschultz was not well considered and that the rationale of Williams v. Liberty Mutual Fire Ins. Co., 334 Mass. 499, 135 N.E.2d 910 (1956) and Abady v. Hanover Fire Ins. Co., 266 F.2d 362 (4th Cir. 1959) should control. Williams and Abady reveal factual arenas in which windstorms had removed coverings from openings leading to the inside of buildings. Several days after the windstorms, water and water pipes froze with resulting damage. Recovery was denied in each of the cases on the theory that "direct loss from wind," meant immediate physical damage resulting from the "effect of the wind" in one case and "damage due to the strength or force of the wind," in the other. Without approving the logic in either one of these decisions, I will proceed to distinguish each from the case at bar. In each, a logical argument could be made that it was the cold weather, rather than the windstorm, that caused the damage. In those cases the cold spell occurred days after the wind, and, therefore, the damage was a remote, rather than a direct and proximate result of the storm. Here, it is conceded that the loss of power was the direct result of the storm. The food thus spoiled and the damage resulted as a direct and natural consequence of the loss of the power. True enough, as argued by the Direct Damage Insurers, Justice Cardozo refused to recognize the proximate cause rule in Bird v. St. Paul Fire & Marine Ins. Co., 224 N.Y. 47, 120 N.E. 86, 13 A.L.R. 875 (1918). The great weight of respectable authority has declined to

4. " * * * Nor is our decision to be taken as promulgating a general rule that federal courts need never abide by determinations of state law by state trial courts. As indicated by the Fidelity Union Trust Co. case, other situations in other states may well call for a different result." 333 U.S. at 162, 68 S.Ct. at 493.

follow the thinking of that eminent Justice and abandon the "proximate cause" theory. The decisions consider, as suggested by the Justice, the expectation and purpose of the ordinary businessman when making an ordinary business contract. For that matter, I could with all grace and sincerity apply the Cardozo reasoning to the contracts in question. The ordinary businessman when making an ordinary insurance contract would in all probability believe that the language in question would cover this type of loss. In all likelihood, there would be no controversy between plaintiff and the Direct Damage Insurers, if Central's policy was not in existence. Direct Damage Insurers contention that the food spoilage was a remote and not a direct loss by windstorm is without merit.

Even if Williams, Abady and Bird were not distinguishable, I would follow what I believe to be the common sense logic, and the resulting conclusions reached in Lipschultz. The Supreme Court of Oregon, if the precise problem was presented, would, I believe, arrive at the same conclusion as the Minnesota court. We must keep in mind that the policies insured property in Oregon; that the law of Oregon applies and that Direct Damage Insurers were presumed to know that the Oregon courts had treated the words "direct" and "proximate" as synonomous. For that matter, the courts of Indiana, the state in which defendant Indiana Lumbermen's Mutual Insurance Co., has its principal office and place of business, use the same formula, in the same area, as that stated by the Minnesota court and here adopted. Fidelity Phenix Fire Ins. Co. v. Anderson, 81 Ind.App. 124, 130 N.E. 419 (1921).

■ Where the language of insurance contracts is plain and unambiguous, such as the language used in the present contracts, the intentions of the parties to the contracts must be gathered from the language used. The office of the court is to ascertain the language used and then enforce it in accordance with its legal effect. Weidert v. State Ins. Co., 19 Or. 261, 24 P. 242 (1890); Smith v.

Germania Fire Ins. Co., 102 Or. 569, 202 P. 1088 (1922).

■ At this point, it is well to call attention to the specific exclusions mentioned in the windstorm endorsement. Although many risks are excluded, nothing is said about excluding the risk which is the source of this controversy. A recognized general rule is that such exclusion clauses must be strictly construed against insurance companies. I–L Logging Co. v. Manufacturers & Wholesalers Indemnity Exch., 202 Or. 277, 273 P.2d 212, 275 P.2d 226 (1954).

■ The Direct Damage Insurers insist that the court must consider the evidence of the "practical interpretation" placed on the policy by the plaintiff, in first presenting the claim to Central, and not presenting one to the Direct Damage Insurers, until after Central had denied the claim under its special risk policy. None of the arguments advanced are of significance and the rule cannot be used where the contract is unambiguous. The acts of the parties cannot prove a construction, contrary to the plain meaning of the contract. Lakeshore Gardens Drainage Dist. v. California-Oregon Power Co., 162 Or. 26, 90 P.2d 1038 (1939).

■ Assuming, arguendo, that the insurance contracts are ambiguous, then the insurers carry an exceptionally heavy burden. That burden was carried by the insurers in Close-Smith v. Conley, 230 F.Supp. 411 (D.Or.1964), cited by the Direct Damage Insurers. There the court held, among other things, that the practical interpretation, as placed on the insurance policies by the parties, should be used in determining the intent. The insurance contract, in Conley, was clearly ambiguous and the evidence presented was clear and convincing that the policies in question were never intended to cover a project which was entirely separate and distinct from that specifically named in the policies. Here, I find nothing in the actions of the parties, nor in plaintiff's interpretation of the policies, which would require a finding relieving the Di-

rect Damage Insurers of liability. In arriving at a conclusion, a court must constantly keep in mind that insurers act as their own scriveners in drafting their own policies and the attached endorsements and if, in the process, they select and use language which is capable of two interpretations, each the peer of the other and equally reasonable, the insurer must be charged with the dilemma and the resulting ambiguity resolved against it. In this case, however, I do not believe that the claims of the Direct Damage Insurers even reach a plane of equality with the contentions of plaintiff. The Supreme Court of Oregon has repeatedly approved the principle that if the words selected by the insurer are susceptible of more than one meaning, the contract must be strictly construed against it. Roberts v. Union Ins. Soc., 215 Or. 183, 332 P.2d 600 (1958); Farmers Mutual Ins. Co. v. United Pacific Ins. Co., 206 Or. 298, 292 P.2d 492 (1956); Schweigert v. Beneficial Standard Life Ins. Co., 204 Or. 294, 282 P.2d 621 (1955). The Direct Damage Insurers' argument that the rules of strict construction should not be used against them for the reason that the language "direct loss" is used in ORS 744.100, the statute setting forth some of the requirements of a standard fire policy, is extremely tenuous and shadowy. If I were concerned with the provisions of a standard fire insurance policy, the provisions of which were standardized by the state legislature, the argument might have weight. Here, however, we are concerned with language placed by the insurers on a special endorsement to a fire policy. The same thinness of rationality exists in the argument that the substitute consequential damage clause attached to the policy indicates an intention to cover only that loss which might be caused by direct damage without the intervention of some other independent cause. With, or without the original or the substitute consequential damage clause, I remain principally concerned with the language "direct loss by windstorm." The argument on the consequential damage clause merely begs the question.

Finally, the Direct Damage Insurers argue that special kinds of insurance coverage are available for off premises power failure and that since such an endorsement was not placed on the policy, the parties must have intended not to include this type of loss in the policy. The witness, on whose testimony the Insurers rely, admitted that both specific and blanket coverages are available and that the blanket type of coverage would include the same perils as the specific endorsement. In the light of the witness's admissions and of the specific exclusions in the endorsement previously mentioned, the merit, if any, of this contention disappears. Fisher v. California Ins. Co., 236 Or. 376, 388 P.2d 441 (1964), treats of an entirely different type of policy and is of no aid to the Insurers. Interstate Indemnity Co. v. Simpson, 155 F.Supp. 855 (D.Or.1957), is factually distinguishable and does not apply. On all of the evidence in the case, I find against the contentions of the Direct Damage Insurers and in favor of the contentions of the plaintiff against said Insurers.

II. Central urges that its special risk policy should be reformed so as to exclude fire and extended coverage perils at sprinklered locations. There is no substantial dispute as to the facts. All of Central's special risk policies issued to plaintiff prior to the one under scrutiny, specifically excluded fire and extended coverage perils, including windstorms, at plaintiff's sprinklered locations. The evidence [5] fully supports a finding that plaintiff and Central, at the time this insurance was negotiated did not intend the special risk policy to cover fire and extended coverage perils. When the omission was discovered by plaintiff's agent in charge of its insurance, she promptly notified the agent for Central of the omission. Some time later she was informed by the agent that a specific exclusion was unnecessary because of a

5. Freitag, Retzlaff, Stansberry, Hays and others.

change in language of the policy. With this explanation and understanding Central and plaintiff put the matter to rest and, insofar as the record discloses, the subject was not mentioned until after the windstorm damage. It is argued that there was no mutual mistake which could form the basis of a reformation, in view of the fact that the omission was called to the attention of Central and Central failed to prepare and attach a proper exclusion. The argument lacks merit. The mutual mistake was present and the subsequent actions of the parties would not change that status, unless the conduct amounted to a waiver or to an estoppel by reason of plaintiff changing its position. Neither the doctrine of waiver, nor the doctrine of estoppel is here germane. Waiver is the voluntary relinquishment of a known right. Grau v. Northwestern Mutual Ins. Co., 221 Or. 240, 350 P.2d 1082 (1960); Eaid v. Nat'l. Cas. Co., 122 Or. 547, 259 P. 902 (1927). In order to waive a policy provision, there must be prior knowledge of that which is waived. It requires both knowledge of the existence of the right and an intention to relinquish it. Appleman, Insurance Law & Practice § 9086. Here, there was no intention on the part of Central to waive the exclusion. For that matter, the evidence is that both Central and the plaintiff believed that the exclusion was contained in the policy. The requirements that the evidence must show a definite antecedent agreement upon which the minds of the parties actually met, *Manning Lbr. Co. v. Voget*, 188 Or. 486, 216 P.2d 674 (1950); *Williams v. Swartz*, 222 Or. 223, 350 P.2d 1079 (1960), and that the evidence must be clear, definite, cogent and un-

equivocal, *Williams v. Swartz, supra; Lundgren v. Freeman*, 307 F.2d 104 (9th Cir. 1962) have been met by Central. Even if the mistake was one of law, I would find and hold that the refusal of equitable relief would, under the facts of this case, lead to a wholly inequitable result within the doctrine stated in Northwestern Ice & Cold Storage Co. v. Wemme, 159 Or. 415, 80 P.2d 881 (1938).

In complete support of my finding that the parties intended Central's special risk policy to exclude fire and extended coverage perils at the sprinklered locations, is the stated position of plaintiff at the time of trial [6] and its belief as expressed in its brief,[7] that the special risk policy issued by Central was intended to cover only those risks not specifically covered by the fire and extended coverage provisions of the other policies. It is my considered finding that there is clear and convincing evidence that Central's special risk policy was never intended to cover fire and extended coverage perils at sprinklered locations.

The Direct Damage Insurers, rather than plaintiff, are the parties who most strenuously resist reformation. Quite frankly, I am of the belief that such insurers do not have sufficient standing to argue the question, other than as friends of the court. There is no showing that their position, or the language of their policies, was based on the type of policy issued by Central. For that matter, the record is devoid of evidence that the Direct Damage Insurers had any knowledge of the type of policies issued by Central.

Assuming, however, that the Direct Damage Insurers have standing to chal-

---

6. "We don't contend that Central Mutual has insurance on top of the fire coverages. It was not our intention to provide that type of insurance with Central Mutual, but it was our intention with Central Mutual to cover by their special risk policy the type of coverages that were not covered under the fire and extensive [sic] coverage policy in all locations, whether sprinklered or non-sprinklered." Tr., p. 11.

7. "It has never been the intention of the Plaintiff that it had duplicate insurance. It was merely its intention to provide fire and extended coverage insurance for both its sprinklered and non-sprinklered locations, such coverage being obtained in the direct damage insurers and Central Mutual, respectively." Brief for Plaintiff, p. 12.

lenge the reformation, I find nothing in their arguments, or the cases cited by them, to change either my findings or my conclusions. Lemoge Electric v. County of San Mateo, 46 Cal.2d 659, 297 P.2d 638 (1956) is inapposite. There, the parties seeking reformation, had full and complete knowledge of the mistake before proceeding with the execution of the contract. Here, the mistake was not recognized by the parties until after the loss had occurred. Knowledge on the part of Central of the absence of a specific exclusion is of no significance under the facts as I find them. Knight v. Electric Household Utilities Corp., 133 N.J.Eq. 87, 30 A.2d 585 (1943), is consistent with Lemoge, but is of no help under the facts here presented. There an employee continued working for several years under an employment contract. He was aware of the fact that a mistake had been made, but continued accepting the lower wage. The court denied reformation on the well known principle of law that one who knowingly acquiesces in the contract as written, cannot seek reformation. Since Central did not recognize the mistake, as I find the facts, these cases are of no help.

On the issues outlined in the pre-trial order, I have disposed of the first issue by holding that the loss before me was a "Direct Loss by Windstorm" within the meaning of the Direct Damage Insurers' policies and that Central, under issue number two, is entitled to reformation of its all risk policy by adding language excluding coverage for damage at sprinklered locations caused by fire or extended coverage perils. Further, I find that Central's policy, as reformed, does not cover plaintiff's loss here in question and that the Direct Damage Insurers' policies alone cover the plaintiff's loss. Additionally, I find that the plaintiff used all reasonable means to save, protect and preserve the property following the loss.

Plaintiff is entitled to a reasonable attorney's fee and the Direct Damage Insurers are liable for such fee in the sum of $1,500.00.

My findings on the principal issues remove from consideration the many problems presented on apportionment and contribution. If properly before me, I would decide those issues in conformity with the doctrines of apportionment and contribution stated and applied in Lamb-Weston v. Oregon Automobile Ins. Co., 219 Or. 110, 341 P.2d 110, reh. den. 346 P.2d 643 (1959); General Ins. Co. v. Saskatchewan Gov't. Ins. Office, 78 Or. Adv.Shts. 679, 391 P.2d 616 (1964), and Oregon Auto Ins. Co. v. United States Fidelity & Guar. Co., 195 F.2d 958 (9th Cir. 1952).

The agreed facts and this Opinion shall serve as my findings and conclusions. Counsel for plaintiff and defendant Central, shall prepare, serve and present an appropriate judgment and decree.